William J. GILLEN, Plaintiff–
Appellant, Cross–Appellee,

v.

ATALANTA SYSTEMS, INCORPORATED and James A. O'Hare, Defendants–
Appellees, Cross–Appellants.

Nos. 92–3175 and 92–3270.

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1993.

Decided June 21, 1993.

Order Denying Rehearing Aug. 12, 1993.

David M. McDorman (argued), Madison, WI, for plaintiff-appellant.

Gordon Davenport, III (argued), Foley & Lardner, Madison, WI, for defendants-appellees.

Before CUDAHY and ROVNER, Circuit Judges, and REAVLEY, Senior Circuit Judge.*

REAVLEY, Senior Circuit Judge.

This is a case about a boat and the broken partnership that owned the boat. William J. Gillen claims that his former partner, James A. O'Hare, breached their partnership agreement and tortiously interfered with Gillen's prospective contractual relation. O'Hare counterclaims to collect an overdue debt owed by Gillen. The district court entered summary judgment dismissing several of Gillen's claims. After a bench trial on Gillen's

---

\* Hon. Thomas M. Reavley, Senior Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

remaining claims and O'Hare's counterclaim, the district court awarded Gillen $1 in nominal damages for O'Hare's breach of contract, and ordered Gillen to pay O'Hare the overdue debt, penalty interest on that debt, and attorney's fees. We can only affirm in part and keep the remainder alive.

## I. BACKGROUND

### A. Pertinent Terms of the Partnership Agreement

In 1989, William J. Gillen purchased a 25% interest in the yacht "Atalanta" from James A. O'Hare and Atalanta Systems, Inc. (collectively "O'Hare"). O'Hare was the sole owner prior to Gillen's purchase. The parties executed a partnership agreement to govern the sale and their relationship as co-owners (the Agreement). Gillen paid $50,000 down and financed the remaining $112,500 balance through O'Hare at an interest rate of 5%. The Agreement calls for semiannual payments of the debt and imposes a penalty interest rate of prime–plus–2% on any overdue payment. Additionally, the Agreement entitles O'Hare to recover attorney's fees incurred in collecting overdue payments.

Under the Agreement, the partners have an equal voice in the use, operation, and management of the boat. The Agreement requires each partner to "[b]e just and faithful to the other of them and at all times give to such other full information and truthful explanations of all matters related to the affairs of the partnership."

Paragraph 11(b) of the Agreement provides a buy-out procedure that will automatically terminate the partnership by one partner buying out the other. Either partner can invoke the 11(b) buy-out procedure by making a written offer to sell his partnership interest to the other. The offer must specify the price and any other terms and conditions, and is irrevocable for 30 days. The other partner has 30 days to accept the offer. If he does not accept the first offer within that 30–day period, he is automatically deemed to have made a reverse offer to sell his partnership interest on the same terms specified in the first offer. The reverse offer is considered automatically accepted, so that the orig-

inal offeror-seller becomes the buyer and the partnership is terminated. As explained by Gillen, the initiating partner slices the pie, and the other partner chooses the piece.

### B. Gillen's Unpaid Debt

Gillen was unable to pay the installments due in April and October 1991. O'Hare agreed to allow Gillen to defer payment on the principal and to pay only the accrued interest. The parties dispute whether the penalty-interest provision came into effect, given O'Hare's consent to the principal deferment.

### C. Third–Party Offers to Buy the Boat

In December 1991, two parties expressed an interest in buying the boat. The first offer was from Lorenzo Banchero for $425,000. That offer was submitted through the partners' broker and was subject to a survey and sea trial of the boat. Gillen and O'Hare declined to accept that offer of Banchero. The other offer came from Ray Lotto and was submitted directly to O'Hare. O'Hare kept Gillen informed of his discussions with Lotto. Lotto only wanted to buy a 50% interest in the boat, and was willing to pay $240,000. Gillen and O'Hare could not agree on whose interest Lotto would buy: Gillen wanted Lotto to buy his 25% share and buy the other 25% from O'Hare, while O'Hare wanted Lotto to purchase half of his share (37.5%) and half of Gillen's share (12.5%). Thus, Gillen and O'Hare did not accept Lotto's offer.

### D. O'Hare Invokes the 11(b) Buy-out Procedure

On December 31, 1991, O'Hare invoked the 11(b) buy-out procedure by submitting to Gillen a written offer to buy or sell based on a whole (100%) boat value of $360,000. The effect of the offer was that Gillen had the option to purchase O'Hare's 75% interest for $270,000 or to sell his 25% interest for $90,000. (According to O'Hare, this $360,000 price for the intra-partnership buy out was roughly equivalent to a $425,000 offer from a third party, given the transaction costs associated with selling to a third party.)

On January 2, Gillen and O'Hare learned that Banchero might be willing to pay $450,-000 for the boat. Gillen then had a financial incentive to buy the boat from O'Hare and sell it to Banchero. Gillen planned to purchase O'Hare's interest in the yacht for $270,000 and simultaneously (or nearly simultaneously) sell the boat to Banchero for $450,000. Meanwhile, O'Hare realized that the price he set in his December 31 offer was low.

Gillen claims that O'Hare informed Gillen on January 3 that he was not going to permit a survey and sea trial of the boat, which was docked at O'Hare's residence in Annapolis, Maryland. On January 5, O'Hare sent a letter by fax to Gillen attempting to revoke his December 31 offer. On January 6, Gillen sent a letter by fax accepting O'Hare's December 31 offer to sell the 75% interest for $270,000. In his acceptance, Gillen indicated that the transaction would close on January 31, 1992, and that he would arrange a survey and sea trial of the boat prior to the closing. In response to Gillen's January 6 letter, O'Hare sent Gillen a letter by fax claiming that Gillen's acceptance was not valid because O'Hare had previously withdrawn his December 31 offer.

O'Hare concedes that, from January 6 to January 9, he was unwilling to permit a survey and sea trial of the boat. Gillen contends that O'Hare's refusal lasted well beyond January 9.

Between January 7 and January 13, Gillen and O'Hare made several attempts to resolve their disputes, and to proceed with a sale to Banchero as partners. But Gillen and O'Hare could not reach an agreement. On January 9, Gillen bypassed the partnership's broker (who would not make an offer to Banchero without the consent of both Gillen and O'Hare) and sent his own letter to Banchero's agent. In that letter, Gillen advised Banchero's agent: that Gillen was planning to acquire 100% interest in the boat by January 31, 1992; that Gillen would sell the boat to Banchero for $450,000; and that the sale to Banchero would be subject to a pre-closing survey and sea trial. The parties dispute Banchero's response to Gillen's letter.

Gillen filed the instant lawsuit on January 14, 1992. On that same day, O'Hare sent a letter by fax to Gillen proposing a settlement of their dispute. The letter also stated that, if Gillen was unwilling to settle, O'Hare would stand by his original December 31 offer to buy or sell and would expect Gillen to close the buy out on January 31. Gillen refused to settle and failed to close the purchase of O'Hare's interest on January 31. The sale to Banchero never proceeded.

## E. Present Owner of the Boat—Not Disputed

When this lawsuit was originally filed, the parties disputed who owned the boat after January 31, 1992. Both parties now agree that O'Hare's December 31 offer reversed on January 31, pursuant to the 11(b) buyout procedure. Thus, on January 31, Gillen was deemed to have made an offer to sell his share for $90,000, and O'Hare was deemed to have accepted that offer. So Gillen's ownership interest passed to O'Hare on January 31.

## F. District Court Proceedings

In the district court, Gillen claimed that O'Hare breached the Agreement by refusing to allow Gillen to conduct a survey and sea trial of the boat, by revoking his December 31 offer, and by refusing to disclose the whereabouts of Lotto, a potential purchaser of the boat. In addition to his breach of contract claims, Gillen alleged that O'Hare intentionally interfered with a prospective contractual relation. O'Hare counterclaimed to collect the overdue installments, penalty interest, and attorney's fees incurred in collecting the debt.

The district court entered a partial summary judgment in favor of O'Hare, dismissing Gillen's claim that O'Hare breached the Agreement by not permitting a survey and sea trial and Gillen's claim for intentional interference with a prospective contractual relation. Additionally, the district court concluded that O'Hare's revocation of his December 31 offer was only temporary and that Gillen could show no resulting damages. The court reserved for trial the issue of whether O'Hare's revocation was in fact a

breach that might entitle Gillen to nominal damages. Gillen's claims concerning O'Hare's revocation and Lotto's whereabouts and O'Hare's counterclaims to collect overdue installments and penalty interest proceeded to a bench trial. At the close of Gillen's case-in-chief, the district court dismissed Gillen's claim that O'Hare breached the Agreement by not disclosing the whereabouts of Lotto. Upon completion of the bench trial, the district court held: Gillen was entitled to $1 in nominal damages for O'Hare's temporary revocation of his December 31 offer; and O'Hare was entitled to collect the overdue installments, penalty interest on the overdue debt, and 75% of his attorney's fees incurred in prosecuting his own counterclaims and in defending against Gillen's claims. Both Gillen and O'Hare appeal.

## II. DISCUSSION

### A. Breach of Contract Claim—Refusing to Permit a Survey and Sea Trial

Gillen hoped to buy O'Hare's interest pursuant to the 11(b) buy-out procedure and simultaneously sell the boat to Banchero. Gillen claims he needed to conduct a survey and sea trial of the boat to evaluate O'Hare's December 31 offer as well as to negotiate a sale with Banchero, who required a survey and sea trial before acquiring the boat. A "survey" requires that the boat be hoisted out of the water and is a detailed inspection by an expert to determine the soundness of a vessel and to detect flaws that might not be apparent to a non-expert. A "sea trial" is the equivalent of a road test for an automobile. Gillen estimates that it would have taken one or two days to complete the contemplated survey and sea trial, at no expense to O'Hare.

■ The parties dispute the extent of O'Hare's refusal to allow a survey and sea trial of the boat, which was docked at O'Hare's residence. Gillen contends that O'Hare's refusal lasted from January 3, 1992 until January 29, 1992, just two days before the expiration of O'Hare's 30-day 11(b) offer. O'Hare, however, claims that his refusal did not continue after January 9, 1992. This factual dispute was not resolved because the district court concluded that O'Hare was not obligated to permit a survey and sea trial. The court's conclusion was based on its interpretation of the buy-out provision. Paragraph 11(b) does not mention a right to conduct a survey and sea trial as a condition of an intra-partnership buy out. The district court refused to infer such a right. We review *de novo* the district court's construction of the Agreement.[1]

■ In holding that Gillen had no right to a survey and sea trial, the district court relied too heavily upon the language (or lack of language) in Paragraph 11(b). Other provisions of the Agreement, specifically Paragraph 14 and Paragraph 7(c), support Gil-

---

1. Gillen's reliance on section 2–513 of the Uniform Commercial Code in arguing that he had a right to inspect and conduct a sea trial of the boat is misplaced. Section 2–513 provides:

> Unless otherwise agreed ... where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner....

Wis.Stat. § 402.513. Section 2–513 governs the *performance*, not the *formation* (offer and acceptance), of contracts. Section 2–513 does not give the parties the right to inspect the goods before accepting *an offer* to buy. Rather, it gives contracting parties a right to inspect before accepting *the good* or before making payment. The purpose of the provision is so buyers can determine if the goods are in conformity with an existing contract, and if not, exercise their right to reject the nonconforming *good*. *See* U.C.C. § 2–513 cmt. 9 (" 'Inspection' under this section has to do with the buyer's check-up on whether the seller's performance is in accordance with a contract previously made and is not to be confused with the 'examination' of the goods or of a sample or model of them at the time of contracting which may affect the warranties involved in the contract.").

Gillen has agreed that his 25% interest in the boat transferred to O'Hare on January 31, 1992. On appeal, Gillen is *not* arguing that his January 6, 1992 acceptance of O'Hare's December 31 offer created a binding contract between Gillen and O'Hare. And he is *not* arguing that he needed the survey and sea trial merely to "check-up on whether [O'Hare's] performance [was] in accordance with a contract previously made." *See id.* Rather, Gillen contends that O'Hare's refusal to permit a survey and sea trial prevented him from acquiring O'Hare's interest and selling the boat to Banchero. Gillen is arguing that he had a right to a survey and sea trial so that he could *evaluate* O'Hare's *offer* and negotiate a sale with Banchero. Section 2–513 provides no such right.

len's contention that he had a right to conduct a survey and sea trial.

Paragraph 14 of the Agreement gives Gillen and O'Hare an equal voice in the use, operation, and management of the boat (the "equal voice" provision). O'Hare contends that this provision precludes unilateral use or operation of the boat. According to O'Hare, the "equal voice" provision gave O'Hare the unconditional right to prevent Gillen from conducting a survey and sea trial. The district court agreed with O'Hare's interpretation of the "equal voice" provision and held: "[A]s long as both partners owned the yacht, both had an equal say whether a survey and sea trial would be conducted. If [Gillen] had succeeded in purchasing [O'Hare's] interest, then he could have allowed as many sea trials and surveys as he pleased." The problem with the district court's analysis is that it ignores Paragraph 7(c) which requires both partners to "be just and faithful to the other of them" (the "just and faithful" provision). The "equal voice" provision must be read together with the "just and faithful" provision. Thus, O'Hare could not prevent Gillen from conducting a survey and sea trial unless O'Hare was acting justly and faithfully. The triggering of the 11(b) buy-out procedure did not abrogate his duty to act justly and faithfully, just as it did not modify the "equal voice" provision.

Because O'Hare may have had a justifiable reason for refusing to permit the survey and sea trial, we must remand this breach of contract claim for further proceedings. We note, however, that O'Hare's conduct would not qualify as "just and faithful" if it was motivated merely by his desire to prevent Gillen from purchasing the boat and selling it to Banchero.[2]

O'Hare contends that, even if Gillen had the right to conduct a survey and sea trial, Gillen can prove no damages caused by O'Hare's refusal to permit the survey and sea trial. We cannot reach that conclusion on this summary judgment record. An issue is raised in the summary judgment record that a survey and sea trial were necessary for Gillen to be able to purchase O'Hare's interest and then sell the boat to Banchero.

### B. Intentional Interference with a Prospective Contractual Relation

In addition to his breach of contract claim, Gillen seeks to recover in tort for intentional interference with a prospective contractual relation. Gillen's tort and contract claims are based on the same underlying facts. Under Wisconsin law, "there must be a duty existing independently of the performance of [a] contract for a cause of action in tort to exist." *Landwehr v. Citizens Trust Co.*, 110 Wis.2d 716, 329 N.W.2d 411, 414 (1983); *accord Greenberg v. Southeastern Wis. Title Co.*, 171 Wis.2d 485, 492 N.W.2d 147, 152 (1992). We see no independent duty in this case. Thus, Gillen may not proceed with his tort claim.[3]

### C. Breach of Contract Claim—O'Hare's Temporary Revocation of His December 31 Offer

On December 31, 1991, O'Hare invoked the 11(b) buy-out procedure by making an offer to sell or buy the boat based on a 100% boat value of $360,000. On January 5, O'Hare attempted to revoke his offer, which was irrevocable under Paragraph 11(b). O'Hare's refusal to honor his December 31 offer lasted until January 14, when O'Hare informed Gillen that he would stand by his original offer. On January 31, the date of the proposed closing, O'Hare was prepared

2. In holding that Paragraph 11(b) does not provide a right to a survey and sea trial, the district court noted that if it inferred such a right for the offeree (Gillen), it would also have to infer that the offeror (O'Hare) has the right to conduct a survey and sea trial *before* making the 11(b) buy-out offer, which after 30 days could turn into an automatic acceptance of the reverse offer. The district court recognized that the offeror (O'Hare) might want to conduct a survey and sea trial before making his 11(b) buy-out offer to ensure that his offer truly represents the value of the yacht.

Under our interpretation of the Agreement, specifically the "equal voice" provision and the "just and faithful" provision, either partner, at anytime, has the right to conduct a survey and sea trial, unless the other partner has a justifiable reason for prohibiting such use.

3. Although this was not the basis for the district court's summary judgment, we may affirm a summary judgment on any ground that finds support in the record.

to sell or buy according to his December 31 offer. Thus, O'Hare's revocation was only temporary.

The district court, in its summary judgment opinion, held that, even if this temporary revocation was a breach, Gillen failed to present any evidence of damages. The court noted that Gillen failed to adduce evidence showing that the temporary revocation affected Gillen's ability to procure financing or affected his negotiations with a third party. Accordingly, the court ruled that Gillen could seek only nominal damages. After the bench trial, the court concluded that the temporary revocation was indeed a breach of the Agreement and awarded Gillen nominal damages of $1. Both parties appeal the district court's holdings.

O'Hare contends that his temporary revocation should not be deemed a breach because he was prepared to honor the offer on January 31, 1992. We disagree. As recognized by the district court, the revocation, though temporary, was a significant departure from the anticipated 11(b) buy-out procedure.

With respect to damages, we agree with the district court's summary judgment holding that Gillen presented no evidence of damages. At the summary judgment stage, Gillen failed to even explain how O'Hare's temporary revocation undermined his negotiations with Banchero. We can imagine possible ways this might have interfered with Gillen's negotiations,[4] but our review of the summary judgment cannot go beyond inferences drawn from documents before the district court.[5]

From our reading of the record, Gillen's primary complaint concerns O'Hare's refusal to permit a survey and sea trial, not O'Hare's temporary revocation of his December 31 offer.

## D. Other Issues on Appeal

### 1. O'Hare's Refusal to Disclose the Whereabouts of Lotto

Prior to O'Hare's invoking the 11(b) buy-out procedure, O'Hare, on behalf of the partnership, and Ray Lotto discussed the possibility of Lotto purchasing a 50% interest in the boat. O'Hare kept Gillen apprised of these negotiations, but O'Hare and Gillen could not agree on whose share Lotto would buy. After O'Hare triggered the 11(b) buy-out procedure, Gillen asked O'Hare for Lotto's phone number so that he could try to convince Lotto to buy his (Gillen's) interest in the boat. Gillen claims that O'Hare refused to tell him how to contact Lotto.

The Agreement requires both parties to give each other "full information and truthful explanations of all matters relating to the affairs of the partnership." Gillen claims that O'Hare breached the Agreement by refusing to tell him how to contact Lotto. We affirm the court's determination that Gillen's desire to learn Lotto's whereabouts was for his own benefit, not that of the partnership, and that therefore O'Hare was not obligated to disclose Lotto's phone number.

### 2. O'Hare's Counterclaim Concerning Overdue Installments

Paragraph 1(b) of the Agreement obligates Gillen to pay O'Hare semiannual installments of $7,216.55. Paragraph 1(d) of the Agreement imposes a penalty-interest rate on late payments, and entitles O'Hare to collect reasonable legal costs incurred in collecting late payments. The parties dispute whether O'Hare is entitled to penalty interest on Gillen's overdue debt and dispute the proper amount of attorney's fees.

Gillen was unable to pay the installments due in April and October 1991. O'Hare agreed to allow Gillen to defer payment on the principal and to make interest payments only. O'Hare contends that he did not agree

---

**4.** In his appellate brief, Gillen notes, without supporting evidence, that O'Hare *might* have told Banchero's agent that Gillen had no right to buy O'Hare's share of the boat. Based on this possibility, Gillen argues that we should infer that the reason Banchero declined to enter into a contract with Gillen was because O'Hare called into question Gillen's right to buy from O'Hare and sell to Banchero. The problem, however, is that

we have no evidence from which to infer such facts.

**5.** By contrast, Gillen presented sufficient summary judgment evidence of a causal connection between O'Hare's refusal to permit a survey and sea trial and Gillen's inability to buy the boat and resell it to Banchero.

to forgo the penalty interest when he agreed to allow Gillen to make only interest payments. Based on the testimony at trial, the district court concluded that O'Hare did not waive his right to penalty interest. The district court entered judgment, ordering Gillen to pay the penalty-interest rate on the overdue amounts and $30,423.75 in attorney's fees.

On appeal, Gillen does not contest the district court's determination that O'Hare did not waive his right to penalty interest. Instead, Gillen argues that the penalty-interest provision never came into effect because O'Hare's agreement to the deferral was a modification of Paragraph 1(b), which sets out the amount of the installments. Thus Gillen contends that he was actually not late on any payment. We find no merit to Gillen's argument and affirm the district court's award of penalty interest.

Gillen also attacks the district court's award of attorney's fees. The Agreement entitles O'Hare to collect only those fees incurred in collecting the overdue installments, not fees associated with defending against Gillen's affirmative claims. Because the district court's award of attorney's fees includes fees associated with O'Hare's defense of Gillen's claims, we would not affirm the award even if the judgment were otherwise affirmed. Since further proceedings are required, a proper award will be necessary subsequently.

### III. CONCLUSION

We remand for further proceedings Gillen's claim that O'Hare breached the Agreement by refusing to allow Gillen to conduct a survey and sea trial. We affirm the district court's dismissal of Gillen's intentional-interference claim; the district court's award of nominal damages to Gillen for O'Hare's temporary revocation of his December 31 offer; the district court's holding that O'Hare did not breach the Agreement by refusing to disclose the whereabouts of Lotto; and the district court's award of Gillen's overdue debt with penalty interest. The award of attorney's fees is vacated.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Before CUDAHY and POSNER, Circuit Judges, and REAVLEY, Senior Circuit Judge.

### ORDER

This matter comes before this court for its consideration of the following:

1. PETITION FOR REHEARING WITH SUGGESTION FOR REHEARING EN BANC, filed herein on July 2, 1993, by defendants.

2. PETITION FOR REHEARING filed herein on July 6, 1993, by plaintiff.

**IT IS ORDERED** that the Suggestion for Rehearing En banc was distributed to all active judges of this court. As no judge in active service has voted to grant rehearing en banc, the Petition for Rehearing with Suggestion for Rehearing En banc is **DENIED.**

**IT IS FURTHER ORDERED** that the Petition for Rehearing filed by plaintiff William J. Gillen is **DENIED.**