**ProCD, INCORPORATED, Plaintiff–Appellant,**

v.

**Matthew ZEIDENBERG and Silken Mountain Web Services, Inc., Defendants–Appellees.**

**No. 96–1139.**

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1996.

Decided June 20, 1996.

1448

Michael J. Lawton, Kenneth B. Axe, Lathrop & Clark, Madison, WI, Thomas N. O'Connor (argued), John T. Gutkoski, Lauren C. Panora, Hale & Dorr, Boston, MA, for ProCD, Inc.

Keith Napolitano, Madison, WI, David A. Austin (argued), Madison, WI, for Matthew Zeidenberg and Silken Mountain Web Services, Inc.

June M. Besek, Morton D. Goldberg, Jesse M. Feder, Schwab, Goldberg, Price & Dannay, New York City, for Information Industry Ass'n, amicus curiae, American Medical Ass'n, amicus curiae and Association of American Publishers, amicus curiae.

Christopher A. Meyer, Michael R. Klipper, Meyer & Klipper, Washington, DC, for Business Software Alliance, amicus curiae.

Barry D. Weiss, Stuart Smith, Ronald Julian Palenski, Gordon & Glickson, Chicago, IL, Kenneth A. Wasch, Mark Nebergall, Software Publishers Ass'n, Inc., Washington, DC, for Software Publishers Ass'n, amicus curiae.

Mark Alan Lemley, University of Texas School of Law, Austin, TX, Peter M.C. Choy, American Committee for Interoperable Systems, Mountain View, CA, for American Committee for Interoperable Systems, amicus curiae.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

■ Must buyers of computer software obey the terms of shrinkwrap licenses? The

district court held not, for two reasons: first, they are not contracts because the licenses are inside the box rather than printed on the outside; second, federal law forbids enforcement even if the licenses are contracts. 908 F.Supp. 640 (W.D.Wis.1996). The parties and numerous amici curiae have briefed many other issues, but these are the only two that matter—and we disagree with the district judge's conclusion on each. Shrinkwrap licenses are enforceable unless their terms are objectionable on grounds applicable to contracts in general (for example, if they violate a rule of positive law, or if they are unconscionable). Because no one argues that the terms of the license at issue here are troublesome, we remand with instructions to enter judgment for the plaintiff.

## I

ProCD, the plaintiff, has compiled information from more than 3,000 telephone directories into a computer database. We may assume that this database cannot be copyrighted, although it is more complex, contains more information (nine-digit zip codes and census industrial codes), is organized differently, and therefore is more original than the single alphabetical directory at issue in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). See Paul J. Heald, The Vices of Originality, 1991 Sup.Ct. Rev. 143, 160–68. ProCD sells a version of the database, called SelectPhone (trademark), on CD–ROM discs. (CD–ROM means "compact disc—read only memory." The "shrinkwrap license" gets its name from the fact that retail software packages are covered in plastic or cellophane "shrinkwrap," and some vendors, though not ProCD, have written licenses that become effective as soon as the customer tears the wrapping from the package. Vendors prefer "end user license," but we use the more common term.) A proprietary method of compressing the data serves as effective encryption too. Customers decrypt and use the data with the aid of an application program that ProCD has written. This program, which is copyrighted, searches the database in response to users' criteria (such as "find all people named Tatum in Tennessee,

plus all firms with 'Door Systems' in the corporate name"). The resulting lists (or, as ProCD prefers, "listings") can be read and manipulated by other software, such as word processing programs.

The database in SelectPhone (trademark) cost more than $10 million to compile and is expensive to keep current. It is much more valuable to some users than to others. The combination of names, addresses, and SIC codes enables manufacturers to compile lists of potential customers. Manufacturers and retailers pay high prices to specialized information intermediaries for such mailing lists; ProCD offers a potentially cheaper alternative. People with nothing to sell could use the database as a substitute for calling long distance information, or as a way to look up old friends who have moved to unknown towns, or just as an electronic substitute for the local phone book. ProCD decided to engage in price discrimination, selling its database to the general public for personal use at a low price (approximately $150 for the set of five discs) while selling information to the trade for a higher price. It has adopted some intermediate strategies too: access to the SelectPhone (trademark) database is available via the America Online service for the price America Online charges to its clients (approximately $3 per hour), but this service has been tailored to be useful only to the general public.

If ProCD had to recover all of its costs and make a profit by charging a single price—that is, if it could not charge more to commercial users than to the general public—it would have to raise the price substantially over $150. The ensuing reduction in sales would harm consumers who value the information at, say, $200. They get consumer surplus of $50 under the current arrangement but would cease to buy if the price rose substantially. If because of high elasticity of demand in the consumer segment of the market the only way to make a profit turned out to be a price attractive to commercial users alone, then all consumers would lose out— and so would the commercial clients, who would have to pay more for the listings because ProCD could not obtain any contribution toward costs from the consumer market.

To make price discrimination work, however, the seller must be able to control arbitrage. An air carrier sells tickets for less to vacationers than to business travelers, using advance purchase and Saturday-night-stay requirements to distinguish the categories. A producer of movies segments the market by time, releasing first to theaters, then to pay-per-view services, next to the videotape and laserdisc market, and finally to cable and commercial tv. Vendors of computer software have a harder task. Anyone can walk into a retail store and buy a box. Customers do not wear tags saying "commercial user" or "consumer user." Anyway, even a commercial-user-detector at the door would not work, because a consumer could buy the software and resell to a commercial user. That arbitrage would break down the price discrimination and drive up the minimum price at which ProCD would sell to anyone.

Instead of tinkering with the product and letting users sort themselves—for example, furnishing current data at a high price that would be attractive only to commercial customers, and two-year-old data at a low price—ProCD turned to the institution of contract. Every box containing its consumer product declares that the software comes with restrictions stated in an enclosed license. This license, which is encoded on the CD–ROM disks as well as printed in the manual, and which appears on a user's screen every time the software runs, limits use of the application program and listings to noncommercial purposes.

Matthew Zeidenberg bought a consumer package of SelectPhone (trademark) in 1994 from a retail outlet in Madison, Wisconsin, but decided to ignore the license. He formed Silken Mountain Web Services, Inc., to resell the information in the SelectPhone (trademark) database. The corporation makes the database available on the Internet to anyone willing to pay its price—which, needless to say, is less than ProCD charges its commercial customers. Zeidenberg has purchased two additional SelectPhone (trademark) packages, each with an updated version of the database, and made the latest information available over the World Wide Web, for a price, through his corporation. ProCD filed this suit seeking an injunction against further dissemination that exceeds the rights specified in the licenses (identical in each of the three packages Zeidenberg purchased). The district court held the licenses ineffectual because their terms do not appear on the outside of the packages. The court added that the second and third licenses stand no different from the first, even though they are identical, because they *might* have been different, and a purchaser does not agree to—and cannot be bound by—terms that were secret at the time of purchase. 908 F.Supp. at 654.

## II

Following the district court, we treat the licenses as ordinary contracts accompanying the sale of products, and therefore as governed by the common law of contracts and the Uniform Commercial Code. Whether there are legal differences between "contracts" and "licenses" (which may matter under the copyright doctrine of first sale) is a subject for another day. See *Microsoft Corp. v. Harmony Computers & Electronics, Inc.,* 846 F.Supp. 208 (E.D.N.Y.1994). Zeidenberg does not argue that Silken Mountain Web Services is free of any restrictions that apply to Zeidenberg himself, because any effort to treat the two parties as distinct would put Silken Mountain behind the eight ball on ProCD's argument that copying the application program onto its hard disk violates the copyright laws. Zeidenberg does argue, and the district court held, that placing the package of software on the shelf is an "offer," which the customer "accepts" by paying the asking price and leaving the store with the goods. *Peeters v. State,* 154 Wis. 111, 142 N.W. 181 (1913). In Wisconsin, as elsewhere, a contract includes only the terms on which the parties have agreed. One cannot agree to hidden terms, the judge concluded. So far, so good—but one of the terms to which Zeidenberg agreed by purchasing the software is that the transaction was subject to a license. Zeidenberg's position therefore must be that the printed terms on the outside of a box are the parties' contract—except for printed terms that refer to or incorporate other terms. But why would Wisconsin fetter the parties' choice in this

way? Vendors can put the entire terms of a contract on the outside of a box only by using microscopic type, removing other information that buyers might find more useful (such as what the software does, and on which computers it works), or both. The "Read Me" file included with most software, describing system requirements and potential incompatibilities, may be equivalent to ten pages of type; warranties and license restrictions take still more space. Notice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable (a right that the license expressly extends), may be a means of doing business valuable to buyers and sellers alike. See E. Allan Farnsworth, 1 *Farnsworth on Contracts* § 4.26 (1990); *Restatement (2d) of Contracts* § 211 comment a (1981) ("Standardization of agreements serves many of the same functions as standardization of goods and services; both are essential to a system of mass production and distribution. Scarce and costly time and skill can be devoted to a class of transactions rather than the details of individual transactions."). Doubtless a state could forbid the use of standard contracts in the software business, but we do not think that Wisconsin has done so.

Transactions in which the exchange of money precedes the communication of detailed terms are common. Consider the purchase of insurance. The buyer goes to an agent, who explains the essentials (amount of coverage, number of years) and remits the premium to the home office, which sends back a policy. On the district judge's understanding, the terms of the policy are irrelevant because the insured paid before receiving them. Yet the device of payment, often with a "binder" (so that the insurance takes effect immediately even though the home office reserves the right to withdraw coverage later), in advance of the policy, serves buyers' interests by accelerating effectiveness and reducing transactions costs. Or consider the purchase of an airline ticket. The traveler calls the carrier or an agent, is quoted a price, reserves a seat, pays, and gets a ticket, in that order. The ticket contains elaborate terms, which the traveler can reject by canceling the reservation. To use the ticket is to accept the terms, even terms that in retrospect are disadvantageous. See *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); see also *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, —— U.S. ——, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (bills of lading). Just so with a ticket to a concert. The back of the ticket states that the patron promises not to record the concert; to attend is to agree. A theater that detects a violation will confiscate the tape and escort the violator to the exit. One *could* arrange things so that every concertgoer signs this promise before forking over the money, but that cumbersome way of doing things not only would lengthen queues and raise prices but also would scotch the sale of tickets by phone or electronic data service.

Consumer goods work the same way. Someone who wants to buy a radio set visits a store, pays, and walks out with a box. Inside the box is a leaflet containing some terms, the most important of which usually is the warranty, read for the first time in the comfort of home. By Zeidenberg's lights, the warranty in the box is irrelevant; every consumer gets the standard warranty implied by the UCC in the event the contract is silent; yet so far as we are aware no state disregards warranties furnished with consumer products. Drugs come with a list of ingredients on the outside and an elaborate package insert on the inside. The package insert describes drug interactions, contraindications, and other vital information—but, if Zeidenberg is right, the purchaser need not read the package insert, because it is not part of the contract.

Next consider the software industry itself. Only a minority of sales take place over the counter, where there are boxes to peruse. A customer may place an order by phone in response to a line item in a catalog or a review in a magazine. Much software is ordered over the Internet by purchasers who have never seen a box. Increasingly software arrives by wire. There is no box; there is only a stream of electrons, a collection of information that includes data, an application program, instructions, many limitations ("MegaPixel 3.14159 cannot be used with BytePusher 2.718"), and the terms of

sale. The user purchases a serial number, which activates the software's features. On Zeidenberg's arguments, these unboxed sales are unfettered by terms—so the seller has made a broad warranty and must pay consequential damages for any shortfalls in performance, two "promises" that if taken seriously would drive prices through the ceiling or return transactions to the horse-and-buggy age.

■ According to the district court, the UCC does not countenance the sequence of money now, terms later. (Wisconsin's version of the UCC does not differ from the Official Version in any material respect, so we use the regular numbering system. Wis. Stat. § 402.201 corresponds to UCC § 2–201, and other citations are easy to derive.) One of the court's reasons—that by proposing as part of the draft Article 2B a new UCC § 2–2203 that would explicitly validate standard-form user licenses, the American Law Institute and the National Conference of Commissioners on Uniform Laws have conceded the invalidity of shrinkwrap licenses under current law, see 908 F.Supp. at 655–56—depends on a faulty inference. To propose a change in a law's *text* is not necessarily to propose a change in the law's *effect*. New words may be designed to fortify the current rule with a more precise text that curtails uncertainty. To judge by the flux of law review articles discussing shrinkwrap licenses, uncertainty is much in need of reduction—although businesses seem to feel less uncertainty than do scholars, for only three cases (other than ours) touch on the subject, and none directly addresses it. See *Step–Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91 (3d Cir.1991); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 268–70 (5th Cir.1988); *Arizona Retail Systems, Inc. v. Software Link, Inc.*, 831 F.Supp. 759 (D.Ariz.1993). As their titles suggest, these are not consumer transactions. Step–Saver is a battle-of-the-forms case, in which the parties exchange incompatible forms and a court must decide which prevails. See *Northrop Corp. v. Litronic Industries*, 29 F.3d 1173 (7th Cir.1994) (Illinois law); Douglas G. Baird & Robert Weisberg, *Rules, Standards, and the Battle of the Forms: A Reassessment of* § 2–207, 68 Va. L.Rev. 1217, 1227–31

(1982). Our case has only one form; UCC § 2–207 is irrelevant. *Vault* holds that Louisiana's special shrinkwrap-license statute is preempted by federal law, a question to which we return. And *Arizona Retail Systems* did not reach the question, because the court found that the buyer knew the terms of the license before purchasing the software.

■ What then does the current version of the UCC have to say? We think that the place to start is § 2–204(1): "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance. And that is what happened. ProCD proposed a contract that a buyer would accept by *using* the software after having an opportunity to read the license at leisure. This Zeidenberg did. He had no choice, because the software splashed the license on the screen and would not let him proceed without indicating acceptance. So although the district judge was right to say that a contract can be, and often is, formed simply by paying the price and walking out of the store, the UCC permits contracts to be formed in other ways. ProCD proposed such a different way, and without protest Zeidenberg agreed. Ours is not a case in which a consumer opens a package to find an insert saying "you owe us an extra $10,000" and the seller files suit to collect. Any buyer finding such a demand can prevent formation of the contract by returning the package, as can any consumer who concludes that the terms of the license make the software worth less than the purchase price. Nothing in the UCC requires a seller to maximize the buyer's net gains.

Section 2–606, which defines "acceptance of goods", reinforces this understanding. A buyer accepts goods under § 2–606(1)(b) when, after an opportunity to inspect, he fails to make an effective rejection under § 2–602(1). ProCD extended an opportunity to reject if a buyer should find the license terms

unsatisfactory; Zeidenberg inspected the package, tried out the software, learned of the license, and did not reject the goods. We refer to § 2–606 only to show that the opportunity to return goods can be important; acceptance of an offer differs from acceptance of goods after delivery, see *Gillen v. Atalanta Systems, Inc.,* 997 F.2d 280, 284 n. 1 (7th Cir.1993); but the UCC consistently permits the parties to structure their relations so that the buyer has a chance to make a final decision after a detailed review.

Some portions of the UCC impose additional requirements on the way parties agree on terms. A disclaimer of the implied warranty of merchantability must be "conspicuous." UCC § 2–316(2), incorporating UCC § 1–201(10). Promises to make firm offers, or to negate oral modifications, must be "separately signed." UCC §§ 2–205, 2–209(2). These special provisos reinforce the impression that, so far as the UCC is concerned, other terms may be as inconspicuous as the forum-selection clause on the back of the cruise ship ticket in *Carnival Lines.* Zeidenberg has not located any Wisconsin case—for that matter, any case in any state—holding that under the UCC the ordinary terms found in shrinkwrap licenses require any special prominence, or otherwise are to be undercut rather than enforced. In the end, the terms of the license are conceptually identical to the contents of the package. Just as no court would dream of saying that Select-Phone (trademark) must contain 3,100 phone books rather than 3,000, or must have data no more than 30 days old, or must sell for $100 rather than $150—although any of these changes would be welcomed by the customer, if all other things were held constant—so, we believe, Wisconsin would not let the buyer pick and choose among terms. Terms of use are no less a part of "the product" than are the size of the database and the speed with which the software compiles listings. Competition among vendors, not judicial revision of a package's contents, is how consumers are protected in a market economy. *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756 (7th Cir.1996). ProCD has rivals, which may elect to compete by offering superior software, monthly updates, improved terms of use, lower price, or a better compromise among these elements. As we stressed above, adjusting terms in buyers' favor might help Matthew Zeidenberg today (he already has the software) but would lead to a response, such as a higher price, that might make consumers as a whole worse off.

### III

▮ The district court held that, even if Wisconsin treats shrinkwrap licenses as contracts, § 301(a) of the Copyright Act, 17 U.S.C. § 301(a), prevents their enforcement. 908 F.Supp. at 656–59. The relevant part of § 301(a) preempts any "legal or equitable rights [under state law] that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103". ProCD's software and data are "fixed in a tangible medium of expression", and the district judge held that they are "within the subject matter of copyright". The latter conclusion is plainly right for the copyrighted application program, and the judge thought that the data likewise are "within the subject matter of copyright" even if, after Feist, they are not sufficiently original to be copyrighted. 908 F.Supp. at 656–57. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 676 (7th Cir.1986), supports that conclusion, with which commentators agree. E.g., Paul Goldstein, III *Copyright* § 15.2.3 (2d ed.1996); Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 101[B] (1995); William F. Patry, II *Copyright Law and Practice* 1108–09 (1994). One function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if "subject matter of copyright" includes all works of a *type* covered by sections 102 and 103, even if federal law does not afford protection to them. Cf. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (same principle under patent laws).

But are rights created by contract "equivalent to any of the exclusive rights within the general scope of copyright"? Three courts of appeals have answered "no." *National Car Rental System, Inc. v. Computer Associates International, Inc.,* 991 F.2d 426, 433 (8th Cir.1993); *Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488, 1501 (5th Cir.1990); *Acorn Structures, Inc. v. Swantz,* 846 F.2d 923, 926 (4th Cir.1988). The district court disagreed with these decisions, 908 F.Supp. at 658, but we think them sound. Rights "equivalent to any of the exclusive rights within the general scope of copyright" are rights established *by law*—rights that restrict the options of persons who are strangers to the author. Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying. A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights." Someone who found a copy of SelectPhone (trademark) on the street would not be affected by the shrinkwrap license—though the federal copyright laws of their own force would limit the finder's ability to copy or transmit the application program.

Think for a moment about trade secrets. One common trade secret is a customer list. After *Feist,* a simple alphabetical list of a firm's customers, with address and telephone numbers, could not be protected by copyright. Yet *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), holds that contracts about trade secrets may be enforced—precisely because they do not affect strangers' ability to discover and use the information independently. If the amendment of § 301(a) in 1976 overruled *Kewanee* and abolished consensual protection of those trade secrets that cannot be copyrighted, no one has noticed—though abolition is a logical consequence of the district court's approach. Think, too, about everyday transactions in intellectual property. A customer visits a video store and rents a copy of *Night of the Lepus.* The customer's contract with the store limits use of the tape to home viewing and requires its return in two days.

May the customer keep the tape, on the ground that § 301(a) makes the promise unenforceable?

A law student uses the LEXIS database, containing public-domain documents, under a contract limiting the results to educational endeavors; may the student resell his access to this database to a law firm from which LEXIS seeks to collect a much higher hourly rate? Suppose ProCD hires a firm to scour the nation for telephone directories, promising to pay $100 for each that ProCD does not already have. The firm locates 100 new directories, which it sends to ProCD with an invoice for $10,000. ProCD incorporates the directories into its database; does it have to pay the bill? Surely yes; *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), holds that promises to pay for intellectual property may be enforced even though federal law (in *Aronson,* the patent law) offers no protection against third-party uses of that property. See also *Kennedy v. Wright,* 851 F.2d 963 (7th Cir. 1988). But these illustrations are what our case is about. ProCD offers software and data for two prices: one for personal use, a higher price for commercial use. Zeidenberg wants to use the data without paying the seller's price; if the law student and Quick Point Pencil Co. could not do that, neither can Zeidenberg.

■ Although Congress possesses power to preempt even the enforcement of contracts about intellectual property—or railroads, on which see *Norfolk & Western Ry. v. Train Dispatchers,* 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991)—courts usually read preemption clauses to leave private contracts unaffected. *American Airlines, Inc. v. Wolens,* —— U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), provides a nice illustration. A federal statute preempts any state "law, rule, regulation, standard, or other provision ... relating to rates, routes, or services of any air carrier." 49 U.S.C.App. § 1305(a)(1). Does such a law preempt the law of contracts—so that, for example, an air carrier need not honor a quoted price (or a contract to reduce the price by the value of frequent flyer miles)? The Court allowed that it is possible to read the statute that

broadly but thought such an interpretation would make little sense. Terms and conditions offered by contract reflect private ordering, essential to the efficient functioning of markets. — U.S. at —– – —–, 115 S.Ct. at 824–25. Although some principles that carry the name of contract law are designed to defeat rather than implement consensual transactions, *id.* at —– n. 8, 115 S.Ct. at 826 n. 8, the rules that respect private choice are not preempted by a clause such as § 1305(a)(1). Section 301(a) plays a role similar to § 1301(a)(1): it prevents states from substituting their own regulatory systems for those of the national government. Just as § 301(a) does not itself interfere with private transactions in intellectual property, so it does not prevent states from respecting those transactions. Like the Supreme Court in *Wolens,* we think it prudent to refrain from adopting a rule that anything with the label "contract" is necessarily outside the preemption clause: the variations and possibilities are too numerous to foresee. *National Car Rental* likewise recognizes the possibility that some applications of the law of contract could interfere with the attainment of national objectives and therefore come within the domain of § 301(a). But general enforcement of shrinkwrap licenses of the kind before us does not create such interference.

*Aronson* emphasized that enforcement of the contract between Aronson and Quick Point Pencil Company would not withdraw any information from the public domain. That is equally true of the contract between ProCD and Zeidenberg. Everyone remains free to copy and disseminate all 3,000 telephone books that have been incorporated into ProCD's database. Anyone can add SIC codes and zip codes. ProCD's rivals have done so. Enforcement of the shrinkwrap license may even make information more readily available, by reducing the price ProCD charges to consumer buyers. To the extent licenses facilitate distribution of object code while concealing the source code (the point of a clause forbidding disassembly), they serve the same procompetitive functions as does the law of trade secrets. *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.,* 925 F.2d 174, 180 (7th Cir.1991). Li-

censes may have other benefits for consumers: many licenses permit users to make extra copies, to use the software on multiple computers, even to incorporate the software into the user's products. But whether a particular license is generous or restrictive, a simple two-party contract is not "equivalent to any of the exclusive rights within the general scope of copyright" and therefore may be enforced.

REVERSED AND REMANDED.