Mary E. DeFONTES and Nicholas T.
Long, individually and on behalf of a
class of persons similarly situated

v.

DELL, INC., et al.

Nos. 2004–137–Appeal, 2004–114–Appeal.

Supreme Court of Rhode Island.

Dec. 14, 2009.

Christopher Whitney, Providence, Esq., Joseph Makalusky, Pro Hac Vice, for Plaintiff.

Stephen MacGilivray, Esq., Darlene Alt, Providence, Esq., Heather Pierce, Esq., John Shope, Pro Hac Vice, for Defendant.

Present: GOLDBERG, FLAHERTY, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Chief Justice WILLIAMS (ret), for the Court.

The defendants, Dell, Inc. f/k/a Dell Computer Corp. (Dell), Dell Catalog Sales LP (Dell Catalog), Dell Marketing LP (Dell Marketing), QualxServ, LLC (Qualx-Serv), and BancTec, Inc. (BancTec), collectively (defendants), appeal from a Superior Court order denying their motion to stay proceedings and compel arbitration. This case is the first of two companion cases now before this Court. *See Long v. Dell Inc.*, No.2007–346–M.P., 984 A.2d 1074 (R.I., filed Dec. 14, 2009). It arises out of a long-frustrated putative class-action suit

brought against the defendants. For the reasons set forth below, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

This litigation began on May 16, 2003, when Mary E. DeFontes, individually and on behalf of a class of similarly situated persons, brought suit against Dell, alleging that its collection of taxes from them on the purchase of Dell optional service contracts violated the Deceptive Trade Practices Act, G.L.1956 chapter 13.1 of title 6. Ms. DeFontes asserted that service contracts, such as the option service contract offered by Dell, were not taxable within the State of Rhode Island. Nicholas Long joined the suit as a plaintiff, and an amended complaint was filed on July 16, 2003, that also added Dell subsidiaries Dell Catalog and Dell Marketing, and two service providers, QualxServ and BancTec as defendants.[1]

Dell is an international computer hardware and software corporation. Within the Dell corporate umbrella, Dell Catalog and Dell Marketing primarily are responsible for selling computers via the internet, mail-order catalogs, and other means to individual and business consumers. Dell ships these orders throughout all fifty states from warehouses located in Texas and Tennessee. As part of these purchases, Dell offers consumers an optional service contract for on-site repair of its products, with Dell often acting as an agent for third-party service providers, including BancTec and QualxServ. Parties opting to purchase a service contract are charged a "tax," which is either paid to the State of Rhode Island directly or collected by the third-party service provider and then remitted to the state.

1. The plaintiffs also added a common-law negligence claim to their amended complaint.

The two initial plaintiffs, Ms. DeFontes and Mr. Long, engaged in slightly different transactions. Ms. DeFontes purchased her computer through Dell Catalog and selected a service contract with Banc-Tec. She paid a total of $950.51, of which $13.51 was characterized as tax on the service contract. Mr. Long purchased his computer through Dell Marketing and opted for a service contract managed by Dell. In total, he paid $3,037.73, out of which $198.73 was designated as tax paid on the service contract. There is no allegation that Dell improperly retained any of the collected tax. Several months after plaintiffs filed their amended complaint, defendants filed a motion to stay proceedings and compel arbitration, citing an arbitration provision within the parties' purported agreements.[2] The defendants argued that the arbitration provision was part of a "Terms and Conditions Agreement," which they contended plaintiffs had accepted by accepting delivery of the goods. Specifically, they averred that plaintiffs had three separate opportunities to review the terms and conditions agreement, to wit, by selecting a hyperlink on the Dell website, by reading the terms that were included in the acknowledgment/invoice that was sent to plaintiffs sometime after they placed their orders, or by reviewing the copy of the terms Dell included in the packaging of its computer products.

The hearing justice issued a written decision on January 29, 2004. He first addressed which state law to apply to the parties' dispute. After determining that the choice-of-law provision included in the terms and conditions agreement, which identified Texas as the controlling jurisdiction, was enforceable, he then analyzed whether the parties had, in fact, agreed to be bound by the terms and conditions agreement. The hearing justice found that although plaintiffs had three opportunities to review the terms, none was sufficient to give rise to a contractual obligation. First, he noted that plaintiffs could have reviewed the terms and conditions agreement had they clicked a hyperlink that appeared on Dell's website. The hearing justice found, however, that this link was "inconspicuously located at the bottom of the webpage" and insufficient to place customers on notice of the terms and conditions.[3] Nevertheless, the hearing justice noted that the terms and conditions

---

**2.** The arbitration clause in Ms. DeFontes' "Terms and Conditions Agreement," quoted by the hearing justice in his decision, provided,

> "ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE, WHETHER PREEXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, COMMON LAW, INTENTIONAL TORT AND EQUITABLE CLAIMS) AGAINST DELL, its agents, employees, successors, assigns or affiliates * * * arising from or relating to this Agreement, its interpretation, or the breach, termination or validity thereof, the relationships which result from this Agreement (including, to the full extent permitted by applicable law, relationships with third parties who are not signatories to this Agreement), Dell's advertising, or any related purchase SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM (NAF) under its Code of Procedure then in effect * * *. The arbitration * * * will be limited solely to the dispute or controversy between Customer and Dell * * *. Any award of the arbitrator(s) shall be final and binding on each of the parties, and may be entered as a judgment in any court of competent jurisdiction."

The arbitration provision in the terms and conditions agreement sent to Mr. Long contained substantially similar language.

**3.** We also note that Mr. Long appears to have purchased his computer over the telephone and it is unclear from the record whether he viewed the Dell website in relation to his purchase.

agreement also appeared both in the acknowledgment that Dell sent to plaintiffs when they placed their orders and later within the packaging when the computers were delivered.[4]

The hearing justice noted that "courts generally recognize that shrinkwrap agreements,[5] paper agreements enclosed within the packaging of an item, are sufficient to put consumers on inquiry notice of the terms and conditions of a transaction." He also observed, however, that shrinkwrap agreements generally contain an express disclaimer that explains to consumers that they can reject the proposed terms and conditions by returning the product. The crucial test, according to the hearing justice, was "whether a reasonable person would have known that return of the product would serve as rejection of those terms." He looked to the introductory language of the terms and conditions agreement, which he quoted as follows,[6]

"*PLEASE READ THIS DOCUMENT CAREFULLY! IT CONTAINS VERY IMPORTANT INFORMATION ABOUT YOUR RIGHTS AND OBLIGATIONS, AS WELL AS LIMITATIONS AND EXCLUSIONS THAT MAY APPLY TO YOU. THIS DOCUMENT CONTAINS A DISPUTE RESOLUTION CLAUSE.*

"This Agreement contains the terms and conditions that apply to purchases by Home, Home Office, and Small Business customers from the Dell entity named on the invoice ('Dell'). By accepting delivery of the computer systems, related products, and/or services and support, and/or other products described on that invoice. [*sic*] You ('Customer') agrees [*sic*] to be bound by and accepts [*sic*] these terms and conditions * * * These terms and conditions are subject to change without prior written notice at any time, in Dell's sole discretion."

The hearing justice found that this language was insufficient to give a reasonable consumer notice of the method of rejection. He found that defendants' failure to include an express disclaimer meant that

---

4. In his analysis of whether plaintiffs had accepted the terms and conditions agreement, the hearing justice did not distinguish the acknowledgment/invoice that plaintiffs received from the nearly identical documents contained in the computer packaging. We note that although defendants provided the hearing justice with evidence of the date plaintiffs received their respective acknowledgments, they did not provide the date of Dell's shipment of the computer systems. On appeal, defendants assert simply that "many customers receive the invoice or acknowledgment before the computer system is shipped * * *." As we may review on appeal only the evidence presented to the hearing justice, we express no opinion regarding the significance, if any, of evidence showing that plaintiffs had received the terms and conditions agreement before shipment of the computer systems. *See Carroll v. Yeaw*, 850 A.2d 90, 92 (R.I. 2004) (record for review in this Court must be made in the trial court). *See generally* 1 White & Summers, *Uniform Commercial Code* §§ 1–4 (5th ed.2006) (discussing whether terms contained in an invoice can be differentiated from terms found on or inside the packaging).

5. A "shrinkwrap agreement" refers to the common commercial practice of including additional terms and conditions either on the outside of a package or within it when it is shipped to the consumer. Often these packages are covered in plastic or cellophane which must be breached to open.

6. The hearing justice appears to have conflated the slightly different language of the terms and conditions agreements sent to Mr. Long and Ms. DeFontes. Although similar, some differences do exist. Significantly, the documents sent to Ms. DeFontes contained an express disclaimer advising her that "[i]f for any reason Customer is not satisfied with a Dell-branded hardware system, Customer may return the system under the terms and conditions of Dell's Total Satisfaction Return Policy * * *."

they could not prove that plaintiffs "knowingly consent[ed]" to the terms and conditions of the agreement. Accordingly, the hearing justice found that Plaintiffs could not be compelled to enter arbitration.

Although the hearing justice noted that it was unnecessary to address plaintiffs' alternative arguments that the contract was both illusory and unconscionable, he discussed them in his decision "for the sake of completeness." First, he rejected plaintiffs' argument that the agreement was unconscionable because it prevented them from asserting rights as a class. He found that there was no right under Texas law to proceed as a class action litigant. *See AutoNation U.S.A. Corp. v. Leroy*, 105 S.W.3d 190, 199–200 (Tex.App.2003).

Second, the hearing justice addressed whether the agreement was illusory. He found that the arbitration agreement was not illusory merely because it required plaintiffs to submit to arbitration while allowing defendants to litigate any of its claims in court. He noted the well-settled principle that "although mutuality of obligation is necessary to create a valid contract, 'equivalency of obligation' is not." The hearing justice went on, however, to

find that the terms and conditions agreement was illusory because it included the language "[t]hese terms and conditions are subject to change without prior written notice, at any time, in Dell's sole discretion."[7] He rejected defendants' contention that this language applied only to future transactions and found that it failed to bind defendants to the terms and conditions agreement.

An order of final judgment was entered on March 29, 2004, from which defendants timely appealed. Additionally, defendants filed a motion to stay the Superior Court proceedings. That motion was denied and, after defendants appealed that decision, the two matters were consolidated. On June 13, 2005, upon discovery that Ms. DeFontes was an employee of plaintiffs' counsel, plaintiffs filed an assented to motion to substitute a proposed class representative that replaced Ms. DeFontes with Julianne Ricci.[8] After plaintiffs filed a substituted first amended class action complaint, defendants renewed their motion to stay the proceedings and to compel arbitration, which was denied, as was defendants' subsequent motion for entry of final judgment of that order.[9]

---

7. The hearing justice mistakenly characterized his consideration of whether the agreement was illusory as an issue of substantive unconscionability. The distinction is important as the former concerns whether the parties formed a contract and the latter is a defense against its enforcement. While the determination of whether the entire agreement is unconscionable is reserved for the arbitrator, we may consider whether the agreement was illusory. *Compare JLM Industries, Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 169–70 (2d Cir.2004) (unconscionability of entire agreement an issue for the arbitrator to decide), *with Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002) (arguing contract is illusory attacks the very existence of an agreement and therefore a matter for the courts).

8. Ms. Ricci purchased her computer through Dell Catalog and selected a service contract with BancTec. In total, she paid $1,722.26, out of which $16.31 was designated as tax paid on the service contract. Ms. Ricci's terms and conditions agreement contained the identical introductory provision as Mr. Long's.

9. Litigation has continued in the Superior Court while this appeal has been pending. The defendants filed a motion for summary judgment in March 2007. In response, plaintiffs noted that a portion of defendants' argument implicated Rhode Island tax law and requested that the tax administrator for the Rhode Island Division of Taxation be notified of the proceeding. Upon notification, the tax administrator filed a motion to intervene in the case, which was granted. Shortly thereaf-

## II

## Discussion

■ We review the trial court's denial of a motion to compel arbitration *de novo*. *See Kristian v. Comcast Corp.*, 446 F.3d 25, 31 (1st Cir.2006). The parties acknowledge that because their transactions involved interstate commerce, the Federal Arbitration Act (FAA) is applicable. *See* 9 U.S.C. §§ 1 through 16. Congress enacted the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–20, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). It requires enforcement of privately negotiated arbitration agreements "save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. Thus, once a court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue" it "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

■ Yet, the United States Supreme Court has been equally insistent that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960));

*see also Mirra Co. v. School Administrative District No. 35*, 251 F.3d 301, 304 (1st Cir.2001) ("Arbitration is a contractual matter, and no party may be forced to arbitrate a dispute unless she has expressly agreed to do so by contract."). The determination of whether the parties have formed an agreement to arbitrate is a matter of state contract law. *See* 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Moreover, a hearing justice's determination of "[w]hether a party has agreed to be bound by arbitration is a question of law subject to this Court's de novo review." *Stanley-Bostitch, Inc. v. Regenerative Environmental Equipment Co.*, 697 A.2d 323, 325 (R.I.1997) (citing *Providence Teachers' Union v. Providence School Committee*, 433 A.2d 202, 205 (R.I.1981)).

■ Before addressing the merits of this issue, we pause to briefly discuss the appropriate law that should be applied in this case, an issue not adequately addressed by the parties. The terms and conditions agreement that is the subject of this litigation contains a choice-of-law provision designating Texas as the controlling jurisdiction. Generally, "parties are permitted to agree that the law of a particular jurisdiction will govern their transaction." *Terrace Group v. Vermont Castings, Inc.*, 753 A.2d 350, 353 (R.I.2000) (quoting *Sheer Asset Management Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I. 1999)). "Moreover, the Restatement (Second) *Conflict of Laws* § 187(2)(a) (1971)

---

ter, the tax administrator filed a motion to dismiss citing, *inter alia*, the Superior Court's lack of subject-matter jurisdiction. The hearing justice denied the tax administrator's motion to dismiss on October 17, 2007, but entered an order permitting immediate appeal to this Court. The state filed a notice of appeal and both the state and Dell filed petitions for writs of certiorari, which we grant-

ed. On June 11, 2008, we also granted the state's motion to consolidate the petition for certiorari with the appeal from the denial of the motion to dismiss, but we denied Dell's motion to consolidate the present case with the petition for certiorari. We addressed those consolidated matters in *Long v. Dell, Inc.*, No.2007–346–M.P, 984 A.2d 1074 (R.I., filed Dec. 14, 2009).

states that '[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied * * * unless * * * the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice.'" *Sheer Asset Management Partners*, 731 A.2d at 710. We apply our own procedural law, however, "even if a foreign state's substantive law is applicable." *McBurney v. The GM Card*, 869 A.2d 586, 589 (R.I.2005) (quoting *Oyola v. Burgos*, 864 A.2d 624, 626–27 n. 2 (R.I.2005)).

The plaintiffs initially argued before the hearing justice that, because the entire "agreement" was unenforceable, the choice-of-law provision should not be given effect. Nevertheless, in submissions both to the hearing justice and to this Court, plaintiffs assert that the issue is irrelevant because both jurisdictions require "the proponent of arbitration to prove the existence of a written agreement to arbitrate" and have adopted the Uniform Commercial Code (U.C.C). Relying on *Prima Paint Corp. v. Flood and Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the hearing justice ruled that he was obligated to enforce the choice-of-law provision because he was precluded from resolving questions regarding the validity of the entire contract. As neither party contests the hearing justice's application of the choice-of-law provision, and noting that both jurisdictions have adopted the U.C.C, we will assume without deciding that Texas law governs questions pertaining to the formation of the purported arbitration agreement. *See Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1092 (1st Cir.1989) ("When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter."); *see also Superior Boiler Works, Inc. v. R.J. Sanders, Inc.*, 711 A.2d 628,

633 (R.I.1998) (U.C.C. Article 2, § 2–207 "adopted largely verbatim" in Rhode Island); *Rogers v. Dell Computer Corp.*, 138 P.3d 826, 831 (Okla.2005) (labeling conflict-of-law issue under nearly identical circumstances "contrived"); *Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 59 n. 3 (Tex.2008) ("Because the transaction here involved a sale of goods, the Uniform Commercial Code * * * applies.").

We therefore evaluate whether plaintiffs are bound by the terms and conditions agreement by resorting to a careful review of the provisions of the U.C.C. Under U.C.C. § 2–204, contracts for the sale of goods may be formed "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Tex. Bus. & Com.Code Ann. § 2.204 (Vernon 1994). The U.C.C. creates the assumption that, unless circumstances unambiguously demonstrate otherwise, the buyer is the offeror and the seller is the offeree. *See Klocek v. Gateway, Inc.*, 104 F.Supp.2d 1332, 1340 (D.Kan.2000). Moreover, U.C.C. § 2–206 provides in relevant part,

"(a) Unless otherwise unambiguously indicated by the language or circumstances,

"(1) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;

"(2) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods * * *." Tex. Bus. & Com.Code Ann. § 2.206 (Vernon 1994).

If contract formation occurred at the moment Dell's sales agents processed the customer's credit card payment and

agreed to ship the goods, as plaintiffs argue, then any additional terms would necessarily be treated as "[a]dditional [t]erms in [a]cceptance or [c]onfirmation" under U.C.C. § 2–207[10] or offers to modify the existing contract under U.C.C. § 2–209. Yet, the modern trend seems to favor placing the power of acceptance in the hands of the buyer after he or she receives goods containing a standard form statement of additional terms and conditions, provided the buyer retains the power to "accept or return" the product.

The eminent Judge Frank Easterbrook has authored what are widely considered to be the two leading cases on so-called "shrinkwrap" agreements. In *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1452–53 (7th Cir.1996), the court challenged the traditional understanding of offer and acceptance in consumer transactions by holding that a buyer of software was bound by an agreement that was included within the packaging and later appeared when the buyer first used the software.[11] *Id.* The court first held that U.C.C. § 2–207 was inapplicable because in cases involving only one form, the "battle-of-the-forms" provision was irrelevant. *ProCD, Inc.,* 86 F.3d at 1452. It then proceeded to evaluate the agreement under U.C.C. § 2–204 and reasoned that "[a] vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance." *ProCD, Inc.,* 86 F.3d at 1452. In *Hill v. Gateway 2000, Inc.,* 105 F.3d 1147, 1148–49 (7th Cir.1997), the court expanded its earlier holding in *ProCD* beyond transactions involving software where the consumer is prompted to accept or decline the terms when he first uses the program. It determined that when a merchant delivers a product that includes additional terms and conditions, but expressly provides the consumer the right to either accept those terms or return the product for a refund within a reasonable time, a consumer who retains the goods beyond that period may be bound by the contract. *Id.* Judge Easterbrook explained,

---

10. Tex. Bus. & Com.Code Ann. § 2.207 (Vernon 1994) provides:

"(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(1) the offer expressly limits acceptance to the terms of the offer;

"(2) they materially alter it; or

"(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

"(c) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title."

11. Although not discussed in the appellate decision, the trial court indicated that the agreement included the language,

"By using the discs and the listings licensed to you, you agree to be bound by the terms of this License. If you do not agree to the terms of this License, promptly return all copies of the software, listings that may have been exported, the discs and the User Guide to the place where you obtained it." *ProCD, Inc. v. Zeidenberg,* 908 F.Supp. 640, 644 (W.D.Wis.1996).

"Practical considerations support allowing vendors to enclose the full legal terms with their products. Cashiers cannot be expected to read legal documents to customers before ringing up sales. If the staff at the other end of the phone for direct-sales operations such as Gateway's had to read the four-page statement of terms before taking the buyer's credit card number, the droning voice would anesthetize rather than enlighten many potential buyers. Others would hang up in a rage over the waste of their time. And oral recitation would not avoid customers' assertions (whether true or feigned) that the clerk did not read term X to them, or that they did not remember or understand it." *Id.* at 1149.

The defendants argue that *ProCD* represents the majority view and we have found considerable support for their contention. *See, e.g., O'Quin v. Verizon Wireless,* 256 F.Supp.2d 512, 515–16 (M.D.La. 2003) ("Terms and Conditions Pamphlet" binding where acceptance expressed by activation and use of wireless services as long as "opportunity to return"); *Bischoff v. DirecTV, Inc.,* 180 F.Supp.2d 1097, 1101 (C.D.Cal.2002) ("Customer Agreement" mailed to each customer along with the first billing statement valid when clearly advised "[i]f you do not accept these terms, please notify us immediately and we will cancel your service"); *Brower v. Gateway 2000, Inc.,* 246 A.D.2d 246, 676 N.Y.S.2d 569, 572 (N.Y.App.Div.1998) (arbitration clause of standard terms and conditions agreement valid where consumer informed that by keeping product beyond thirty days after delivery he was accepting terms); *M.A. Mortenson Co., v. Timberline Software Corp.,* 140 Wash.2d 568, 998 P.2d 305, 308 (2000) (adopting ProCD analysis but noting shrinkwrap agreement explicitly instructed consumers "IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, PROMPTLY RETURN * * * TO THE PLACE OF PURCHASE AND YOUR PURCHASE PRICE WILL BE REFUNDED"). Moreover, as plaintiffs' counsel has initiated nationwide litigation, a number of sister jurisdictions have decided more or less the precise issue put before us in defendants' favor. For instance, in *Stenzel v. Dell, Inc.,* 870 A.2d 133 (Me.2005), the Maine Supreme Judicial Court reviewed a similar terms and conditions agreement sent to Dell customers that included the language,

> "By accepting delivery of the computer systems, related products, and/or services and support, and/or other products described on that invoice [, the customer] agrees to be bound by and accepts these terms and conditions. If for any reason Customer is not satisfied with a Dell-branded hardware system, Customer may return the system under the terms and conditions of Dell's Total Satisfaction Return Policy * * *." *Id,* at 140.

The court held that by "accepting delivery of the computers, and then failing to exercise their right to return the computers as provided by the agreement, [the plaintiffs] expressly manifested their assent to be bound by the agreement * * *." *Id; see also Carideo v. Dell, Inc.,* 520 F.Supp.2d 1241, 1244 (W.D.Wash.2007); *Omstead v. Dell, Inc.,* 473 F.Supp.2d 1018, 1025–26 (N.D.Cal.2007); *Adams v. Dell Computer Corp.,* No. CIV AC–06–089, 2006 WL 2670969 (S.D.Tex. Sept.18, 2006); *Sherr v. Dell Inc.,* No. 05 CV 10097(GBD) 2006 WL 2109436, *3 (S.D.N.Y. July 27, 2006) ("customer need only return the product according to the return policy in order to reject the Agreement"); *Falbe v. Dell, Inc.,* No. 04–C–1425, 2004 WL 1588243, *3 (N.D.Ill.2004) ("Our analysis begins, and could end, with * * * *Hill v. Gateway 2000, Inc."*).

Courts have not been universal in embracing the reasoning of *ProCD* and its progeny, however. In *Step–Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91, 98 (3d Cir.1991), the court determined that when parties exchange the shipment of goods for remuneration the existence of a contract is not in doubt; rather, any dispute relates solely to the nature of its terms. After deciding that U.C.C. § 2–207 applies to situations in which a party sends a confirmatory document that claims to establish additional terms of the contract, the court held that U.C.C. § 2–207 "establishes a legal rule that proceeding with a contract after receiving a writing that purports to define the terms of the parties's contract is not sufficient to establish the party's consent to the terms of the writing to the extent that the terms of the writing either add to, or differ from, the terms detailed in the parties's earlier writings or discussions." *Id.* at 99.[12] The court therefore held that a licensing agreement affixed to the packaging constituted a proposal for additional terms that was not binding unless expressly agreed to by the purchaser. *Id* at 100; *see also Klocek*, 104 F.Supp.2d at 1339, 1341 (finding buyer's "act of keeping the computer past five days was not sufficient to demonstrate that plaintiff expressly agreed to the Standard Terms" and criticizing the *Hill* court's summary dismissal of U.C.C. § 2–207 by stating "nothing in its language precludes application in a case which involves only one form"); *Licitra v. Gateway, Inc.*, 189 Misc.2d 721, 734 N.Y.S.2d 389, 396 (N.Y.Civ.Ct.2001) (construing arbitration clause of a shrinkwrap agreement as a proposal for additional terms under U.C.C. § 2–207 because it materially altered the existing agreement).

The Supreme Court of Oklahoma, which has also been drawn into this nationwide class-action suit against defendants, has rejected *Hill's* reasoning as well. *See Rogers*, 138 P.3d at 833. Although remanding the case to determine whether the arbitration provision was included in the parties' agreement, it noted,

"The plaintiffs' accepting the computers and not returning them is consistent with a contract being formed at the time that the orders were placed and cannot be construed as acquiescing in the 'Terms and Conditions of Sale' document whether included with the invoice or acknowledgment or with the computer packaging. If the contracts were formed at the time the orders were placed, *see* U.C.C. § 2–206(1), the 'Terms and Conditions of Sale' document, including the arbitration provision, would be an additional term of the contracts under section 2–207. The arbitration provision would not be part of the contracts but proposals to add it as a term to the contracts." *Rogers*, 138 P.3d at 833 (citing U.C.C. § 2–207).[13]

---

**12.** The official comment to U.C.C. § 2–207 indicates that the provision applies "where an agreement has been reached orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far agreed upon and adding terms not discussed." U.C.C. § 2–207 Official Comment 1 (2001).

**13.** It appears that the drafters of the Uniform Commercial Code were themselves flummoxed by this issue. Amended U.C.C. § 2–

207, which, although not adopted, could provide some insight into any evolving consensus among commercial law scholars and practitioners, states in Official Comment 5,

"The section omits any specific treatment of terms attached to the goods, or in or on the container in which the goods are delivered. This article takes no position on whether a court should follow the reasoning in *Step–Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91 (3d Cir.1991) and *Klocek v. Gateway, Inc.*, 104 F.Supp.2d 1332 (D.Kan. 2000) (original 2–207 governs) or the con-

After reviewing the case law pertaining to so-called "shrinkwrap" agreements, we are satisfied that the *ProCD* line of cases is better reasoned and more consistent with contemporary consumer transactions. It is simply unreasonable to expect a seller to apprise a consumer of every term and condition at the moment he or she makes a purchase. A modern consumer néither expects nor desires to wade through such minutia, particularly when making a purchase over the phone, where full disclosure of the terms would border on the sadistic. Nor do we believe that, after placing a telephone order for a computer, a reasonable consumer would believe that he or she has entered into a fully consummated agreement. *See Axelson, Inc. v. McEvoy–Willis, a Division of Smith International (North Sea), Ltd.,* 7 F.3d 1230, 1232–33 (5th Cir.1993) ("An offer is an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal."). Rather, he or she is aware that with delivery comes a multitude of standard terms attendant to nearly every consumer transaction.

■ We therefore decline to adopt the minority view, as urged by plaintiffs, that a contract is fully formed when a buyer orders a product and the seller accepts payment and either ships or promises to ship. Instead, formation occurs when the consumer accepts the full terms after receiving a reasonable opportunity to refuse them. Yet in adopting the so-called "layered contracting"[14] theory of formation, we reiterate that the burden falls squarely on the seller to show that the buyer has accepted the seller's terms after delivery. Thus, the crucial question in this case is whether defendants reasonably invited acceptance by making clear in the terms and conditions agreement that (1) by accepting defendants' product the consumer was accepting the terms and conditions contained within and (2) the consumer could reject the terms and conditions by returning the product.

On the first question, defendants notified plaintiffs that "[b]y accepting delivery of the computer systems, related products, and/or services and support, and/or other products described on that invoice[,] You ('Customer') agrees to be bound by and accepts those terms and conditions." This language certainly informed plaintiffs that defendants intended to bind them to heretofore undisclosed terms and conditions, but it did not advise them of the period beyond which they will have indicated their assent to those terms. The defendants argue that the meaning of the term "accepting delivery" is apparent to a reasonable consumer. We are not so sure. *See Licitra,* 734 N.Y.S.2d at 392 ("All terms of the 'Agreement' should not be enforced merely because the consumer retains the equipment for 30 days after receipt, especially because it is unclear when the 30–day period to protest begins. Does it commence upon delivery of the goods to the carrier since the 'Agreement' states that title passes upon 'delivery to the carrier' * * * or does it commence upon receipt by the consumer? Is the time period stayed in the all too common situation where a parent buys the computer as a

trary reasoning of *Hill v. Gateway* 2000, 105 F.3d 1147 (7th Cir.1997) (original 2–207 inapplicable)." Amended § 2–207, Comment 5 (2003).

14. This phrase is taken from the Supreme Court of Washington and is meant to denote that "while some contracts are formed and their terms fully defined at a single point in time, many transactions involve a rolling or layered process." *M.A. Mortenson Co. v. Timberline Software Corp.,* 140 Wash.2d 568, 998 P.2d 305, 313 n. 10 (2000) (quoting the Uniform Computer Information Transactions Act § 208 cmt. 3 (Approved Official Draft)).

present for a student and does not give the gift for several weeks or is the clock ticking while the equipment sits in the box?"). "Acceptance of goods" has a technical meaning not easily discernable to the average consumer.[15] A consumer may believe that simply by opening the package he or she has agreed to be bound by the terms and conditions contained therein. Indeed, many of the courts that have enforced so-called "approve-or-return" agreements cite language informing the consumer of a specific period after which he or she will have accepted the terms. *See, e.g., Hill,* 105 F.3d at 1148 (terms govern if consumer retains beyond thirty days); *Brower,* 676 N.Y.S.2d at 570 ("By keeping your Gateway 2000 computer system beyond thirty (30) days after the date of delivery, you accept the Terms and Conditions."). The more problematic issue, however, is whether plaintiffs were aware of their power to reject by returning the goods.

Significantly, the agreement sent to Ms. DeFontes, who is no longer a plaintiff in this case, contained additional language advising her of the method of rejection. The introductory provision of the terms and conditions agreement that defendants sent to her stated, "[i]f for any reason Customer is not satisfied with a Dell-branded hardware system, Customer may return the system under the terms and conditions of Dell's Total Satisfaction Return Policy * * *." In doing so, defendants explicitly contrasted acceptance of the terms with rejection of the goods, al-beit while retaining some ambiguity whether rejection of defendants' proposed terms could reasonably be construed as dissatisfaction with "Dell-branded hardware." Many of the cases upholding shrinkwrap agreements cite explicit disclaimers advising consumers of their right to reject the terms. *See, e.g., ProCD, Inc. v. Zeidenberg,* 908 F.Supp. 640, 644 (W.D.Wis.1996) ("If you do not agree to the terms of this License, promptly return all copies of the software, listings that may have been exported, the discs and the User Guide to the place where you obtained it."); *Bischoff,* 180 F.Supp.2d at 1101 ("[i]f you do not accept these terms, please notify us immediately and we will cancel your service"); *M.A. Mortenson Co.,* 998 P.2d at 308 ("IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, PROMPTLY RETURN * * * TO THE PLACE OF PURCHASE AND YOUR PURCHASE PRICE WILL BE REFUNDED"). Such explicit language is also present in some of the foreign cases in which defendants have prevailed. *See, e.g., Sherr,* 2006 WL 2109436, at *1 ("[a]greement informs the consumer that by returning the product or refusing delivery in accordance with Dell's return policy, he can reject the terms and conditions"). Although the above language is significantly clearer, the terms and conditions agreement sent to Ms. DeFontes nevertheless made the important connection between acceptance of the terms by accepting delivery and rejection by returning the goods.[16]

---

**15.** Tex. Bus. & Com.Code Ann. § 2.606 (Vernon 1994) provides in relevant part:

"(a) Acceptance of goods occurs when the buyer

"(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

"(2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

"(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

**16.** We do not decide today whether the disclaimer sent to Ms. DeFontes was sufficient to bind her to the terms and conditions.

That this language is absent in the documents sent to current plaintiffs Mr. Long and Ms. Ricci is troubling and raises the specter that they were unaware of both their power to reject and the method with which to do so. The introductory provision that purportedly bound plaintiffs does not mention either the "Total Satisfaction Return Policy" or the thirty-day period in which a consumer may exercise his or her right to return the product. Rather, this policy is explained, if at all, in a distinct section of the terms and conditions agreement, which confusingly informed plaintiffs that "Dell Branded Hardware systems and parts that are purchased directly from Dell by an end-user Customer may be returned by Customer in accordance with Dell's 'Total Satisfaction Return Policy' in effect on the date of the invoice." Thus, the consumer is left to construe these provisions together and infer that his or her right to reject the terms extends beyond what would commonly be understood as the moment of delivery. This separate provision not only fails to establish a clear relationship between the consumer's acceptance of the terms by retaining the goods and his or her right to reject the terms by returning the product, but it further obscures the matter by forcing the consumer to refer to a separate document if he or she wants to discover the full terms and conditions of the "Total Satisfaction Return Policy." Even if the consumer reviews the total satisfaction return policy, we are not convinced that the policy clearly explains to a reasonable consumer that his or her right to return the product includes rejection of the terms and conditions agreement. We believe the hearing justice rightly concluded that although "Dell does provide a 'total satisfaction policy' whereby a customer may return the computer, this return policy does not mention the customer's ability to return based on their unwillingness to comply with the terms."

In reviewing the language of the terms and conditions agreement it cannot be said that it was reasonably apparent to the plaintiffs that they could reject the terms simply by returning the goods. We believe that too many inferential steps were required of the plaintiffs and too many of the relevant provisions were left ambiguous. We are not persuaded that a reasonably prudent offeree would understand that by keeping the Dell computer he or she was agreeing to be bound by the terms and conditions agreement and retained, for a specified time, the power to reject the terms by returning the product. Because we hold that the hearing justice properly denied the defendants' motion to compel arbitration on the ground that the plaintiffs did not agree to be bound by the terms and conditions agreement, we need not discuss any of the alternative grounds the hearing justice offered for denying the defendants' motion to compel arbitration. We must note, however, that the hearing justice found that the purported agreement "fails to bind Defendants in any genuine way" because it gave the defendants the right to change the terms of the agreement "without prior written notice at any time, in Dell's sole discretion." Although we recognize the existence of a formidable argument that such language rendered the purported agreement illusory, we shall leave the analysis of that argument for another day, in keeping with our general aversion towards reaching issues that prove unnecessary for the disposition of the case at bar. See *Irons v. Rhode Island Ethics Commission*, 973 A.2d 1124, 1135 (R.I.2009).

### III

### Conclusion

For the reasons set out above, the judgment of the Superior Court is affirmed.

The papers of the case are returned to the Superior Court.

Chief Justice SUTTELL and Justice ROBINSON did not participate.