# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-3913

_____

William Ballou; Joan Williamson

*Plaintiffs - Appellees*

v.

Asset Marketing Services, LLC, doing business as govmint.com

*Defendant - Appellant*

_____

No. 21-3917

_____

William Culver, on behalf of himself and all others similarly situated

*Plaintiff - Appellee*

v.

Asset Marketing Services, LLC, doing business as govmint.com

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 15, 2022
Filed: August 30, 2022

_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.
_____

BENTON, Circuit Judge.

Three elderly individuals spent tens of thousands of dollars buying collectible coins, often priced far above market value, from Asset Marketing Services, LLC ("AMS"). They sued AMS for violating Minnesota law. AMS moved to stay the case and compel arbitration. The district court refused, and AMS appeals. Having jurisdiction under 9 U.S.C. § 16(a)(1), this Court reverses and remands for trial on the extent to which the parties agreed to arbitrate.

I.

The three plaintiffs are William Ballou, an elderly man who lives in Florida, Joan Williamson, an elderly woman who lives in California, and William Culver, an elderly man who lives in Texas. Each, over 62 years old, subsists on a fixed income.

AMS, doing business as GovMint.com, sells commemorative and collectible coins, often charging thousands of dollars or more. Registered in Delaware, its principal place of business is in Burnsville, Minnesota. In 2016, after investigating AMS's use of aggressive marketing tactics on an elderly, ill woman, the Commissioner of the Minnesota Department of Commerce entered a Consent Order with AMS, prohibiting it from "rely[ing] on any of its written terms or conditions" for sales unless it complied with Minnesota law, or it and the buyer signed a written purchase agreement disclosing the terms. **Consent Order** at 7-8, DCD 1-1.

Between 2015 and 2019, AMS solicited Ballou, Williamson, and Culver more than 50 times over the phone and email. AMS induced Ballou to purchase 127 coins at a price totaling over $630,000. He once paid over $38,995 for one coin. AMS never told Plaintiffs that the market value of their coins was substantially less than what they paid. Similarly, an AMS salesperson sold Williamson 10 coins for

$13,000. Once, he told her she might receive a 400% return on investment. She provided her checking and savings account information. When her checking account was too low to cover AMS's costs, the salesperson withdrew the funds from her savings account. Meanwhile, AMS sold Culver $45,816 in coins, now worth less than a third of what he paid.

On March 12, 2021, Ballou and Williamson sued AMS in the District of Minnesota for violating Minnesota laws prohibiting consumer fraud, deceptive trade practices, and deceptive acts against senior citizens. They sued for themselves and two classes: (1) "All Class members who were also age 62 or over at the time they made the purchase"; and (2) "All ascertainable persons in the United States who purchased one or more coins from either GovMint, or any of its affiliates, successors, predecessors or assigns from 2015 until the present." On May 18, 2021, Culver filed a similar suit in the District.

The district court consolidated the suits. AMS moved to compel arbitration and stay proceedings, based on arbitration provisions in its Terms and Conditions—variously referenced on its website, in emails, during some phone calls, and on invoices shipped with products. The parties produced a voluminous record supporting and opposing the motion. After a hearing, the district court denied AMS's motion. AMS now appeals.

II.

This Court reviews de novo denial of a motion to compel arbitration. *Foster v. Walmart, Inc.*, 15 F.4th 860, 862 (8th Cir. 2021). When the parties submit evidence supporting or opposing the motion, this Court "treats the motion akin to a motion for summary judgment, viewing the record in the light most favorable to the nonmovant." *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 403 (8th Cir. 2021). If the record supporting the motion has a genuine issue of material fact about whether an arbitration agreement exists, this Court remands for trial on the issue. **9 U.S.C. § 4** ("If the making of the arbitration agreement or the failure, neglect, or refusal to

perform the same be in issue, the court shall proceed summarily to the trial thereof."); *Foster*, 15 F.4th at 862; *see id.* at 864 ("If a factual issue exists regarding the formation of the arbitration agreement, remand to the district court for trial is necessary." (cleaned up) (quotations omitted)).

A.

Agreements to arbitrate are "'a matter of contract,' meaning that disputes are arbitrable only to the extent an agreement between the parties says so." *Foster*, 15 F.4th at 862, *quoting* *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). "When deciding whether to compel arbitration, this [C]ourt applies a two-part test: we must first consider whether a valid agreement to arbitrate exists. If a valid agreement exists, we then consider the scope of the agreement." *United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic, Ltd.*, 413 F.3d 786, 788 (8th Cir. 2005) (quotations omitted). The party seeking to compel arbitration bears the burden to prove a valid contract. *Duncan*, 20 F.4th at 402.

"When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *accord* *Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731 (8th Cir. 2009). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options*, 514 U.S. at 944 (quotations omitted).

The parties agree that Minnesota's law applies. Under its law, contract formation requires an offer, acceptance, and consideration. *See* *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 625, 627 (Minn. 1983). "The formation of sales contracts requires mutual assent among the parties involved in the transaction." *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011). Mutual assent, in turn, is assessed under an objective standard. *Id.*

-4-

In this case, there are genuine issues of material fact about whether and when the parties formed contracts that incorporated the arbitration agreement.

B.

The parties dispute whether they formed valid contracts that included the arbitration clause when the Plaintiffs purchased goods over the phone and AMS sent the goods with shipping invoices that mentioned its Terms and Conditions. This issue lies at the intersection of "shrinkwrap"—packaging that lists additional terms—and Section 2-207 of the Uniform Commercial Code.

AMS argues that the shipping invoices formed shrinkwrap contracts, while Plaintiffs counter that the invoices merely proposed additions to the contract. Ultimately, their disagreement hinges on which party was the offeror and which the offeree. This Court concludes that, under Minnesota law, Plaintiffs were the offerors for phone orders, § 2-207 applies to those orders, and AMS has raised a genuine issue of material fact whether some shipping invoices created valid contracts that included the arbitration clause.

Because this issue turns on the offeror and the timing of contract formation, this Court must analyze how shrinkwrap and § 2-207 mesh and apply here.

1.

In a "shrinkwrap agreement," a customer pays first, later receiving a good with the seller's full terms of sale and an opportunity to return the purchase. *See, e.g.*, ***ProCD, Inc. v. Zeidenberg***, 86 F.3d 1447, 1451-52 (7th Cir. 1996). Often, the seller provides an adequate right to return the product and specifies that not returning the product before a deadline constitutes acceptance of its full terms; a consumer who retains the goods beyond the deadline is bound by those terms. *See **id.*** In a "clickwrap agreement," a seller displays terms on a computer screen, and the user

-5-

can proceed only by clicking a button to affirmatively accept the terms. *See id.* at 1449, 1452 (describing clickwrap without using the term); *Foster*, 15 F.4th at 863.

Two Seventh Circuit cases, *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996), and *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997), delineate and uphold shrinkwrap agreements. Many courts, including the U.S. District Court for the District of Minnesota, have applied them. *See, e.g.*, *Rasschaert v. Frontier Commc'ns Corp.*, No. CIV. 12-3108, 2013 WL 1149549, at *6 (D. Minn. Mar. 19, 2013) (collecting cases).

The core logic is that the "'vendor . . . may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance.'" *Hill*, 105 F.3d at 1149, *quoting ProCD*, 86 F.3d at 1452. The shrinkwrap specifies the performance that constitutes acceptance; the buyer accepts by performing as specified. *See ProCD*, 86 F.3d at 1452-53.

In *ProCD* a man bought ProCD software, packaged in a box that listed terms of use, including that a software license controlled its use. *See id.* at 1450-51. The court recognized, "Notice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable (a right that the [software] license expressly extends), may be a means of doing business valuable to buyers and sellers alike." *Id.* at 1451. The software company offered "a contract that a buyer would accept by using the software after having an opportunity to read the license at leisure." *Id.* at 1452. The man accepted the terms by using the software, rather than returning it, after he had an opportunity to inspect those terms. *See id.* (stating that a "consumer who concludes that the terms of the license make the software worth less than the purchase price" "can prevent formation of the contract by returning the package"). He reinforced his acceptance of the license and contract when he used the software after it "splashed the license on the screen and would not let him proceed without indicating acceptance." *Id.*

*ProCD* reasoned that the parties formed a contract under Uniform Commercial Code § 2-204(1): "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. " **U.C.C. § 2-204(1)**; *ProCD*, 86 F.3d at 1452. The software vendor, the offeror, could "invite acceptance by conduct" and "propose limitations on the kind of conduct that constitutes acceptance." *ProCD*, 86 F.3d at 1452. Thus, ProCD's shrinkwrap requiring the buyer either accept its terms or return the purchase for a full refund invited "acceptance by conduct," limiting the kind of conduct that "constitute[d] acceptance." *See id.*

Similarly, in *Hill*, Gateway computer company "shipped computers with the same sort of accept-or-return offer ProCD made to users of its software." *Hill*, 105 F.3d at 1149. When a customer bought a computer over the phone, the computer was shipped with terms that included an arbitration agreement; by not returning the computer within 30 days, the customer accepted the terms. *See id.* at 1148-49. The court viewed Gateway as the offeror, and the buyer as the offeree. *See id.* Because Gateway was the offeror, it could "invite acceptance by conduct," and dictate "the kind of conduct that constitute[d] acceptance." *Id.* at 1149, *quoting* *ProCD*, 86 F.3d at 1452. Gateway effectively defined acceptance as the act of not returning the computer within 30 days of receiving it. *See id.*

*Hill* demonstrates two key elements for shrinkwrap. First, shrinkwrap applies only if the vendor is the offeror; otherwise, the vendor cannot dictate the conduct that constitutes acceptance. *See id.*; *ProCD*, 86 F.3d at 1452. Second, shrinkwrap allows contract formation to occur over an extended period. *See Hill*, 105 F.3d at 1150. *Hill* stated that "a vendor may propose that a contract of sale be formed, not in the store (or over the phone) with the payment of money or a general 'send me the product,' but after the customer has had a chance to inspect both the item and the terms." *Id.*

2.

Unlike *Hill*'s theory of contract formation, § 2-207 applies where the buyer is the offeror.

Under Minnesota law, Uniform Commercial Code Section 2-207 applies when a buyer offers to purchase a good from a seller, the seller accepts—forming a contract—and then seller sends a written confirmation with additional terms in its delivery. Section 2-207 provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>> (a) the offer expressly limits acceptance to the terms of the offer;
>>
>> (b) they materially alter it; or
>>
>> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any

> supplementary terms incorporated under any other provisions of this Act.

**U.C.C. § 2-207**; *see* **Minn. Stat. Ann. § 336.2-207** (restating U.C.C. § 2-207 and changing only "Act" to "chapter" in § 2-207(3)).

*Lemmer v. IDS Properties, Inc.*, 304 N.W.2d 864 (Minn. 1980), applied § 2-207 to terms sent after a phone order. A man was injured while working on the construction of IDS Center, a skyscraper, when scaffolding collapsed on him. *Lemmer*, 304 N.W.2d at 866-67. He sued IDS and the scaffolding vendor, Waco. *Id.* at 866. A delivery order document—which Waco presented when delivering the scaffolding to IDS, and an IDS agent signed—had a hold-harmless clause. *See id.* at 866, 870. The issue on appeal was "whether under the uniform commercial code the hold harmless clause was part of the contract." *Id.* at 870.

The Minnesota Supreme Court found that the parties formed an oral contract before Waco delivered the scaffolding because Waco gave IDS a quote for the scaffolding, and IDS offered to purchase it as quoted, providing its billing information over the phone, which Waco took. *See id.*

When Waco delivered the scaffolding, it included the delivery order document with the hold-harmless clause. *Id.* The court held:

> [T]he delivery order is a written confirmation of the contract which contains additional terms under Minn. Stat. § 336.2-207(1) (1978). Under § 2-207(2) such additional terms are construed as proposals for additions to the contract. Where the transaction is not between merchants the proposals do not become a part of the contract unless they are agreed to by the affected party.

*Id.* at 870-71. The court concluded that IDS was "not a merchant of scaffolding," so the hold-harmless clause was merely a term proposed for addition to the contract. *Id.* at 871. Finally, although IDS's agent signed the document, he lacked authority

to enter into binding agreements on behalf of IDS, and the parties' business practices showed Waco would not deliver without receiving a signature. *See id.* This meant "IDS was entitled to treat the [delivery order] document . . . as just an acknowledgement and no more." *Id.*

*Lemmer* is a straightforward application of § 2-207. Because one party was not a merchant, § 2-207(2)'s exceptions for merchants did not apply. Section 2-207(3) did not apply because the parties' subsequent dealings, including the IDS agent's signature, did not recognize the existence of a contract that included the hold harmless clause. And § 2-207(1)'s exception for acceptance made "expressly . . . conditional on assent to the additional . . . terms" did not apply because Waco failed to make its acceptance expressly conditional, and "the affected party," IDS, had not agreed to the additional terms. *See id.* at 870-71. Thus, the hold harmless clause was construed as a "proposal[] for addition[] to the contract" under § 2-207(2). *Id.* at 870.

Under *Lemmer*, when a buyer makes an oral offer to purchase a good from a vendor and the vendor orally accepts that offer, § 2-207 applies to any new terms in a later, written confirmation. Indeed, U.C.C. § 2-207 explicitly applies when parties reach a prior oral agreement, and one then sends a written confirmation with additional terms. *See* **U.C.C. § 2-207 cmt. 1** ("This section is intended to deal with two typical situations. [O]ne is the written confirmation, where an agreement has been reached . . . orally . . . and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed.").

Later Minnesota cases continue this straightforward approach to § 2-207. *See, e.g.*, ***Jostens, Inc. v. Nat'l Computer Sys., Inc.***, 318 N.W.2d 691, 697-98 (Minn. 1982) (applying Minn. Stat. Ann. § 336.2-2-207(2)(a) to sale of a computer system by manufacturer to computer company as sale between merchants, and finding proposed additional term was not part of contract because offer expressly limited acceptance to the terms of the offer, but the offeree did not accept); ***TRWL Fin.***

***Establishment v. Select Int'l, Inc.***, 527 N.W.2d 573, 579 (Minn. Ct. App. 1995) (applying Minn. Stat. Ann. § 336.2-2-207(2)(b) to sale between merchants and concluding that forum-selection clause in buyer's written confirmation was not part of the contract because it materially altered the contract's terms); ***Co Rect Prod., Inc. v. Cont. Design, Inc.***, No. C7-94-1978, 1995 WL 130587, at *1-2 (Minn. Ct. App. Mar. 28, 1995) (assessing § 2-207 where parties formed oral contract and defendant seller later sent letters to buyer, and citing U.C.C. § 2-207 cmt. 1); *see also* ***St. Paul Structural Steel Co. v. ABI Contracting, Inc.***, 364 N.W.2d 83, 86-87 (N.D. 1985) (stating § 336.2-207 "codifie[s]" U.C.C. § 2-207, and using U.C.C. comment and scholarship to apply § 336.2-207 in North Dakota case governed by Minnesota law).

3.

In sum: *Hill*'s shrinkwrap analysis applies when the vendor is the offeror; the vendor, in its shrinkwrap, dictates the conduct that constitutes acceptance; and the buyer performs that acceptance. Section 2-207, on the other hand, applies when the buyer is the offeror, the vendor accepts the offer, and the vendor later sends a written confirmation that states additional or different terms.

Courts—much like the present parties—disagree about when § 2-207 applies instead of *Hill*'s shrinkwrap theory of contract formation. *See, e.g.*, ***Howard v. Ferrellgas Partners, L.P.***, 748 F.3d 975, 981 (10th Cir. 2014) (describing *Hill's* "theory of contract formation"—that the "commercial relationship . . . began with a telephone order" and "the contract wasn't fully formed during the initial call but continued to form over" further interactions—as "about as controversial an idea as exists today in the staid world of contract law," with some "states ensors[ing] the theory" and others "reject[ing] it"). *Compare* ***Step-Saver Data Sys., Inc. v. Wyse Tech.***, 939 F.2d 91, 103 (3d Cir. 1991) (concluding § 2-207 applies to shrinkwrap terms presented after parties agreed to initial contract, and holding shrinkwrap did not adequately express unwillingness to proceed without assent to the terms), ***Wachter Mgmt. Co. v. Dexter & Chaney, Inc.***, 144 P.3d 747, 755 (Kan. 2006)

(holding—over dissent—that § 2-207 applied, not *Hill*), *and **Rogers v. Dell Computer Corp.***, 138 P.3d 826, 831-33 (Okla. 2005) (concluding, regardless whether Oklahoma or Texas law applied, that § 2-207 controlled whether parties formed valid contract, not *Hill*), *with **M.A. Mortenson Co. v. Timberline Software Corp.***, 998 P.2d 305, 313 (Wash. 2000) (en banc) (holding—over dissent—that *Hill* applied, not § 2-207), *and **DeFontes v. Dell, Inc.***, 984 A.2d 1061, 1071 (R.I. 2009) (holding *Hill* applied, not § 2-207).

Into this fray plunges the present case. Minnesota contract law—not *Hill*—governs whether the parties formed contracts that included the arbitration clause. *See **Donaldson Co.***, 581 F.3d at 731. Minnesota courts have not addressed shrinkwrap contracts, let alone endorsed or rejected the concept. That leaves *Lemmer* as the lone guide for how the parties here formed their contracts.

*Lemmer* requires that § 2-207 control AMS's invoices, not the shrinkwrap theory of contract formation stated in *Hill*. By treating Waco's delivery document as an acceptance with proposed additional terms under § 2-207, *Lemmer* treated Waco—the scaffolding vendor—as the offeree; otherwise, Waco could not have been the accepting party. *See **Lemmer***, 304 N.W.2d at 870-71. The court viewed IDS—the buyer who offered to purchase the scaffolding and provided its billing information—as the offeror. *See **id.*** Together, the parties formed an "oral contract," with IDS providing its "purchase order number for delivery and billing purposes" over the phone. ***Id.*** at 870. Waco's initial act of sending "IDS a quote for [the] scaffolding," was not, itself, an offer. *See **id.*** By holding IDS was the offeror and Waco the offeree, the court made clear that, in a phone order for goods: the vendor's price quote is an invitation to deal, the buyer is the offeror, and the vendor is the offeree. *See **id.*** at 870-71.

Minnesota law is clear about an order to buy goods: When a vendor quotes a price to a potential customer or advertises its product, the vendor makes an invitation for the recipient to make an offer. When a buyer places a purchase order, the buyer makes an offer and is thus the offeror. *See **Reid v. Nw. Implement & Wagon Co.***,

82 N.W. 672, 672 (Minn. 1900) (holding buyer's "written order . . . was merely a conditional offer to purchase" seller's goods); *W. H. Barber Co. v. McNamara-Vivant Contracting Co.*, 293 N.W.2d 351, 355 (Minn. 1979) (holding seller's "price quotation letters . . . were invitations to enter into a bargain"); *see also Ford Motor Credit Co. v. Russell*, 519 N.W.2d 460, 463 (Minn. Ct. App. 1994) ("[I]if goods are advertised for sale at a certain price, it is not an offer and no contract is formed; [it] is merely an invitation to bargain rather than an offer."), *citing* 1 Samuel Williston, **A Treatise on the Law of Contracts** § 4:7 (4th ed. 1990); **Restatement (Second) of Contracts** § 26 (1981).

The Minnesota caselaw aligns with its commercial code: "Unless otherwise unambiguously indicated by the language or circumstances . . . an *order or other offer to buy goods* for prompt or current shipment *shall be construed as inviting acceptance* either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods." **Minn. Stat. Ann. § 336.2-206(1)** (emphasis added); *accord* **U.C.C § 2-206(1)**.

4.

As in *Lemmer*, the parties here formed oral contracts over the phone, and § 2-207 applies to AMS's later invoices. On the phone, AMS provided information about its goods, Plaintiffs offered to buy the goods for money, AMS accepted, and Plaintiffs provided payment information. *See* **Williamson Decl.** ¶ 4, DCD 38 (stating an AMS employee "gave me information about several coins," which "helped me decide to purchase the coins"); **Culver Decl.** ¶ 4, DCD 39 (same); **Ballou Decl.** ¶¶ 5-7, 9, DCD 37 (stating an AMS employee gave "me . . . information about several coins" and "sent me a sample of gold," at which point, "I decided to purchase" the coins, and "gave [him] my credit card number over the phone"). AMS even kept Williamson's bank account information and, when her checking account had insufficient funds to cover a purchase, took the money from her savings account. The money and goods constituted consideration. *See* **Pine River State Bank**, 333 N.W.2d at 626-277 (discussing contract elements). Under *Lemmer*, these phone

orders—where AMS provided product information, Plaintiffs offered to pay, AMS accepted, and Plaintiffs provided billing information—were oral contracts. *See Lemmer*, 304 N.W.2d at 870 (holding parties formed "an *oral contract*" when Waco quoted price, IDS offered to pay it, and Waco accepted, taking IDS's billing information over the phone (emphasis added)); *see also **Klocek v. Gateway, Inc.**, 104 F. Supp. 2d 1332, 1340 (D. Kan. 2000) ("In typical consumer transactions, the purchaser is the offeror, and the vendor is the offeree.").

AMS provides no evidence that the phone orders did not form valid contracts. In fact, the shipping invoices themselves reinforce that the contract had already been formed, displaying on the header, "THANK YOU FOR YOUR ORDER," and stating below, "We thank you for placing your trust in us . . . ." **8/11/17 Invoice**, DCD 31-1 at 92; **8/9/18 Invoice**, DCD 31-1 at 119. AMS also has identified nothing in the record showing that its Terms and Conditions were discussed during every phone order and, as detailed below, even when the terms were discussed, the conversation often did not reflect a meeting of the minds.

As IDS was the offeror in *Lemmer*, so were Plaintiffs here: they placed orders to buy AMS's goods. As Waco was the offeree in *Lemmer*, so was AMS here: it invited Plaintiffs to make offers, then accepted their offers, taking their billing information.

Because Plaintiffs were the offerors and AMS the offeree, AMS did not make an offer and thus cannot dictate any terms of an initial offer, let alone what acts by Plaintiffs might constitute agreement to its terms. Instead, each of AMS's shipping invoices was a written confirmation of acceptance, with its additional terms subject to § 2-207.

A contrary stance—that *Hill*, not § 2-207, applies to the present case—cannot be squared with *Lemmer* because *Lemmer* dictates that, in an initial telephonic order, the buyer is offeror. *Hill*'s logic works if, and only if, the vendor is the offeror. The parties have not identified any Minnesota case, let alone a Minnesota Supreme Court

-14-

case, that suggests *Lemmer* is an outlier. AMS for its part does not even cite *Lemmer* until its reply brief, despite the district court's reliance on that case.

More tellingly, when AMS finally does address *Lemmer*, it offers the hollow distinction that the case "did not concern the formation of a 'shrinkwrap' agreement; and per *Hill*, shrinkwrap agreements do not implicate Section 2-207." **Reply Br.** at 17. This misses the point: the central issue is which party is the offeror. A shrinkwrap agreement is impossible unless AMS was the offeror, but AMS has not explained why it should be considered the offeror, contrary to *Lemmer* and Minnesota contract law. Indeed, AMS does not even mention the words "offeror" or "offeree" in any of its briefs.

AMS does assert, without explanation, that "AMS was the master of its offer," apparently referencing *ProCD*. **Reply Br.** at 14; *see ProCD*, 86 F.3d at 1452 ("A vendor, as master of the offer, may . . . ."). This too begs the question: "The *offeror* is the master of his offer." **Restatement (Second) of Contracts § 30 cmt. a** (1981) (emphasis added); *accord **Newman v. Schiff***, 778 F.2d 460, 466 (8th Cir. 1985) (applying Missouri law). The vendor in *ProCD* was master of the offer, but only because ProCD *made the offer* by placing its software box in a physical retail store for the buyer to pick up, look at, and purchase; its acts, not its status as a vendor, made it the offeror. *See **ProCD***, 86 F.3d at 1451 ("[P]lacing the package of software on the shelf is an 'offer,' which the customer 'accepts' . . . ."); *see also **Foster***, 15 F.4th at 862 (concluding, where plaintiffs purchased seller's gift cards in-store, that seller was the master of its offer). Those facts are a far cry from the traditional *phone-order contract*, in which the vendor quotes a price (inviting the buyer to make an offer), the buyer makes an offer to pay the price, and the vendor accepts by taking the buyer's payment information. *See, e.g.*, **Lemmer**, 304 N.W.2d at 870-71. AMS may wish it had been the offeror, but its unsupported claims to the title mean little in the face of *Lemmer* and the present record.

Finally, *Hill* itself recognized that pre-existing state law may well reject its logic. *See Hill*, 105 F.3d at 1149 (relying on general application of the U.C.C. where

"neither side has pointed us to any atypical doctrines in those states that might be pertinent"). Minnesota law diverges from *Hill* and § 2-207 controls. *Cf. **Wachter Mgmt. Co.***, 144 P.3d at 755 (observing that "[t]he offeror, whether the seller or the buyer, is the master of the offer" under Kansas law, rejecting *Hill*, and instead applying § 2-207 to shrinkwrap, "adher[ing] to the traditional contract principles" of *Step-Saver* and other cases).

5.

Sent after the phone orders, AMS's shipping invoices (with its full terms) constituted "written confirmation[s]" that stated additional terms. *See **Lemmer***, 304 N.W.2d at 870 ("[T]he delivery order is a written confirmation of the contract which contains additional terms under Minn. Stat. § 336.2-207(1)."); **Minn. Stat. Ann. § 2-207(1)**.

Subsection 2-207(1) controls AMS's invoices. Plaintiffs were not "merchants," so § 2-207(2)'s exceptions for merchants do not apply, and neither party argues § 2-207(3) applies. Only the conditional option of § 2-207(1) remains.

Under that subsection, a "written confirmation . . . operates as an acceptance even though it states terms additional to . . . those offered and agreed upon, *unless acceptance is expressly made conditional on assent to the additional . . . terms*." **Minn. Stat. Ann. § 336.2-207(1)** (emphasis added); *accord* **U.C.C. § 2-207(1)**. When the offeree makes "acceptance . . . expressly . . . conditional on assent to the additional terms," the offeree's written confirmation operates as a counter-offer. *See, e.g.*, ***PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.***, 225 F.3d 974, 978-80 (8th Cir. 2000) (surveying § 2-207(1) expressly-conditional counter-offer precedent). If, however, acceptance is not made expressly conditional on assent to the additional terms, then those terms are "construed as proposals for addition to the contract." **Minn. Stat. Ann. § 2-207**; *see **Lemmer***, 304 N.W.2d at 870-71.

The terms in many of AMS's invoices were only proposed additional terms. For example, AMS's August 11, 2017, and August 9, 2018, invoices to Ballou referenced AMS's return policy and its Terms and Conditions, but nowhere did these invoices expressly state that AMS would accept Ballou's offer *only if* he agreed to its full terms. After AMS and Plaintiffs made a contract over the phone, AMS's later invoice was "a written confirmation," and its additional terms formed "proposals for addition to the contract" because AMS did not make its acceptance expressly conditional on Plaintiffs accepting those terms. *See Lemmer*, 304 N.W.2d at 870-71 (holding Waco's delivery document was merely an "acknowledgement" and its additional terms were "proposals for additions to the contract" that "d[id] not become a part of the contract"). These invoices, by themselves, did not form valid contracts that included AMS's full Terms and Conditions.

AMS eventually made its acceptance expressly conditional on buyers accepting its full terms and conditions, but these invoices also raise issues of material fact. For example, the December 12, 2019, invoice to Ballou stated, "GovMint.com is willing to sell its product(s) to you only if you accept all of our Terms and Conditions . . . . If you do not agree . . . , then GovMint.com is unwilling to sell its product(s) to you, [and] you must return your purchase . . . ." **12/12/19 Invoice**, DCD 31-1 at 136. However, this statement fell under the header, "NOTICE FOR ALL PURCHASES *OTHER THAN BULLION ITEMS AND OTHER FINAL SALE ITEMS*." *Id.* (emphasis added). The back of that December 12 invoice stated, "Bullion Items and Final Sale Items may not be returned or cancelled for any reason, at any time . . . ." *Id.* at 2.

AMS has not shown which of Plaintiffs' purchases were included in its express condition (that they accept its full terms), specifically which of Plaintiffs' purchases were neither bullion nor final sale, and thus could be returned. *See id.* ("'Bullion Items' . . . refers to ungraded silver, gold, platinum, or palladium legal tender *coins*; and [certain] bars or rounds; as well as *any other item advertised or marketed by the Company as a 'bullion item'* . . . . " (emphasis added)). *But see* **Ostman Decl.** ¶ 35, DCD 31 (stating Ballou did not purchase any bullion items, but

not addressing final sale items, or purchases by Culver or Williamson). AMS itself acknowledges that at least some purchases were bullion. *See* **Reply Br. at 26 n.29** ("Culver purchased bullion products from AMS . . . ."). Taken in the light most favorable to Plaintiffs, the bullion and final-sale exception raises a genuine issue of material fact about which purchases were bullion or final sale, preventing the additional terms from applying.

AMS also has not shown whether the parties even shared an understanding about what was bullion or final sale, and thus not eligible for return. Mutual assent is a factual question. *See* **Foster**, 15 F.4th at 864 (addressing clickwrap and browsewrap, rather than shrinkwrap). It "entails a 'meeting of the minds concerning [a contract's] essential elements.'" **SCI Minnesota Funeral Servs.**, 795 N.W.2d at 864, *quoting* **Minneapolis Cablesystems v. Minneapolis**, 299 N.W.2d 121, 122 (Minn. 1980). Even if AMS considered Plaintiffs' purchases eligible for return, they may not have understood this, precluding mutual assent.

Similarly, § 2-207 requires the recipient of the additional terms demonstrate "specific and affirmative assent"—"mere acceptance of and payment for goods does not constitute acceptance of all the terms in the seller's counter-offer." **PCS Nitrogen Fertilizer**, 225 F.3d at 979-80 (applying § 2-207 precedent from the First, Sixth, and Ninth Circuits to find that buyer did not accept seller's additional terms, despite accepting and paying for the goods, because no "additional actions or evidence of affirmative assent [we]re present" (quotations omitted)). AMS has not shown Plaintiffs knew which of their purchases were subject to AMS's expressly conditional acceptance. If Plaintiffs thought their goods were bullion or final sale, then AMS's attempted conditional acceptance would have expressly *not* applied. Thus, even if Plaintiffs kept the goods after 30 days, this may not reflect the required affirmative assent to AMS's full terms. Taken in the light most favorable to Plaintiffs, the record contains a genuine issue of material fact whether AMS's expressly conditional invoice language created binding contracts with AMS's full terms.

Some of AMS's shipping invoices may have produced valid contracts that included the arbitration clause. However, the record presents genuine issues of material fact about whether and which invoices did so.[1]

## C.

Invoices aside, AMS argues Plaintiffs agreed to its Terms and Conditions, when, after placing an order for an item and providing their billing information with

---

[1]Even if this were a *Hill*-type shrinkwrap case with AMS as the offeror, genuine issues of material fact would persist for much the same reasons as under § 2-207. Under *ProCD* and *Hill*, if the seller seeks to create a contract that is "formed, not in the store (or over the phone) with the payment of money or a general 'send me the product,' but after the customer has had a chance to inspect both the item and the terms" (and decide whether to perform acceptance by not returning the goods)—*then* the seller must make clear that the buyer accepts *by not returning those goods*. *See* ***Hill***, 105 F.3d at 1150; ***ProCD***, 86 F.3d at 1452 ("A vendor . . . may invite acceptance by conduct, and . . . propose limit[s] on *the kind of conduct* that constitutes acceptance." (emphasis added)); ***ProCD***, 86 F.3d at 1451 (stating the company "expressly extend[ed]" "a right to return the software for a refund if the terms [we]re unacceptable"); ***Register.com, Inc. v. Verio, Inc.***, 356 F.3d 393, 428 (2d Cir. 2004) (stating that "in the shrinkwrap context, the consumer does not manifest assent . . . at the time of purchase; instead, the consumer manifests assent to the terms by later actions," and describing the required later actions as "not seeking a refund within a specified period of time" in *Hill*, and "clicking on a button indicating acceptance" in *ProCD*).

"The crucial question . . . is whether [the vendor] reasonably invited acceptance *by making clear* . . . that (1) by accepting [its] product the consumer was accepting the terms and conditions contained within and (2) the consumer could reject the terms and conditions by returning the product." ***DeFontes***, 984 A.2d at 1071 (emphasis added); *see* ***Schnabel v. Trilegiant Corp.***, 697 F.3d 110, 123 (2d Cir. 2012) ("[T]he offer must . . . make clear to a reasonable consumer both that terms are being presented and that they can be adopted through the conduct that the offeror alleges constituted assent." (quotations omitted)). Even under *Hill*, many of AMS's invoices did not make clear that buyers accepted the full terms by not returning the products. And the invoices' limits on bullion and final-sale items raise a further issue whether buyers even knew their purchases *could be* returned.

a salesperson, they were transferred to a customer service representative who verified their information, read from a script, and mentioned AMS's Terms and Conditions, as well as return policy.

The script's entire reference to the Terms and Conditions is apparently a single question: "[Y]ou understand that all purchases are governed by our Terms and Conditions, one of which is we sell for collectability and not for investment purposes?" *E.g.*, **4/12/16 Ballou Tr. 3:4-7**, DCD 32-1 at 3; **7/6/16 Ballou Tr. 4:7-11**, DCD 32-1 at 13. At some point, the script began stating that the Terms and Conditions were listed online and providing the URL.

Plaintiffs formed valid contracts containing the Terms and Conditions during some of the orders that were followed by these calls. First, Plaintiffs present no evidence disputing that this question was posed as the last part of some phone-order calls. Second, Plaintiffs sometimes affirmed they understood the question. Third, even if the representative did not specifically identify the arbitration clause, a general reference to the Terms and Conditions may provide inquiry notice, and Plaintiffs did not inquire further. *Cf. Foster*, 15 F.4th at 863-64 (distinguishing actual and inquiry notice for website conditions, and finding whether inquiry notice occurred was a disputed fact). Thus, regardless whether the verification process occurred *after* the contract itself had been formed with a salesperson, Plaintiffs demonstrated that they understood the contract included AMS's full terms.

The problem, however, is that Plaintiffs often never displayed any affirmative acknowledgement of the question, let alone assent to it. *See, e.g.*, **12/12/19 Ballou Tr. 10:8-9** (interrupting question to ask, "And do you have my new address?"); **8/27/20 Williamson Tr. 17:15-18**, DCD 32-1 at 119 (following statement, ". . . which means you agree to the terms and conditions on govmint.com," with response, "No, I don't like to return anything"). This, too, poses a fact issue about which orders may be subject to arbitration.

D.

Some of AMS's emails to Ballou and Culver mentioned the arbitration agreement, and others hyperlinked to AMS's Terms and Conditions. AMS, however, provides no evidence that Plaintiffs saw, ever responded to, or otherwise acknowledged these emails, with the exception of one Customer Account Agreement email to Culver. Moreover, Plaintiffs overwhelmingly purchased from AMS over the phone; AMS provides no evidence that they expected to change their relationship by email.

Taken in the light most favorable to Plaintiffs, these emails did not control their later contracts to purchase items or add AMS's terms and conditions to the later contracts. *See **Grandoe Corp. v. Gander Mountain Co.***, 761 F.3d 876, 888 (8th Cir. 2014) (finding plaintiff did not manifest acceptance of modification to terms proposed in email, where plaintiff "never replied to [the] email," the "parties had relied on oral commitments for years, and there [wa]s no evidence that the parties had previously changed the terms of their business relationship in this manner"). At best, AMS created a genuine issue of material fact whether Plaintiffs read AMS's emails and understood them to mean AMS's full terms applied to subsequent purchases.

As to the Customer Account Agreement email to Culver: AMS avers that, after receiving the email, Culver signed the agreement on August 5, 2019. The agreement states that it "governs all transactions and interactions between you and the Company, regardless of whether they occurred (1) prior to or after the Effective Date; and (2) by telephone, text, internet, email, catalog, mailer, or otherwise." **Customer Account Agreement**, DCD 31-2 at 179. However, Minnesota requires consideration to form a valid contract. *See, e.g.*, ***Pine River State Bank***, 333 N.W.2d at 627. AMS does not explain what, if any, consideration was part of the Customer Account Agreement. Thus, AMS has not demonstrated existence of a valid contract. This also presents a genuine issue of material fact.

E.

AMS avers that when Ballou placed his first order in 2015, he did so online. Above the "Place Your Order" button, the site stated in small print, "By placing your order, you agree to GovMint.com's privacy policy and terms and conditions," hyperlinking to them. **Ostman Decl.** ¶¶ 8-11, DCD 31 (providing cropped screenshot). Where a user does not click on the hyperlink and is not required to click a button showing assent, the question becomes whether the user had inquiry notice sufficient to form a contract. *See Foster*, 15 F.4th at 863. The "website's overall design and content, including whether the existence of the relevant terms are reasonably conspicuous to the user" guide this assessment. *Id.* at 864 (cleaned up). AMS provides only a cropped, close-up screenshot of the purchase webpage, with most of the webpage omitted. **Ostman Decl.** ¶ 10. Ballou, meanwhile, does not even remember making a website purchase. *See* **Ballou Decl.** ¶ 12, DCD 37 ("To my knowledge, I have never purchased a coin through Defendant's website. All purchases were made over the phone."). This scant record establishes a fact dispute about whether he and AMS formed a contract that included the terms and conditions for that purchase and his few (if any) other online purchases. Thus, the issue should also proceed to trial. *See Foster*, 15 F.4th at 864-65 (finding whether browsewrap provided inquiry notice was a "material dispute of fact . . . on the question of whether the parties agreed to arbitrate," and remanding for trial (cleaned up)).

The record presents myriad issues of material fact on whether the parties formed contracts that included the arbitration provision. These issues must be resolved at trial. *See id.* at 862; *Duncan*, 20 F.4th at 403; **9 U.S.C. § 4**.

III.

Plaintiffs argue that, even if the parties formed contracts that included the arbitration clause, the Consent Order between AMS and the Commissioner of the Minnesota Department of Commerce prevents AMS from enforcing that clause.

On appeal, AMS advances various new arguments against applying the Consent Order, including that it should be assessed by an arbitrator in the first instance, not a court. This Court declines to address these new arguments. *See, e.g.*, *Tarsney v. O'Keefe*, 225 F.3d 929, 939 (8th Cir. 2000) ("We generally decline to address arguments raised for the first time on appeal."). In any event, Plaintiffs cannot enforce the Order because they lack standing to do so—an argument AMS did raise before the district court.

When a district court's interpretation of a consent "decree is based solely on the written document," this Court reviews the interpretation de novo. *United States v. Knote*, 29 F.3d 1297, 1299 (8th Cir. 1994).

"[F]or a third party to be able to enforce a consent decree, the third party must, at a minimum, show that the parties to the consent decree" intended: (1) "to confer a benefit upon that third party," and (2) "to give that third party a legally binding and enforceable right to that benefit." *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 958 (8th Cir. 2002). "[S]trangers to a consent decree generally do not have standing to enforce a consent decree." *Id.*

Courts construe a consent decree using "principles of contract interpretation, and . . . discern the parties' intent from the unambiguous terms of the written consent decree, read as a whole." *Id.* However, "even when interpreting the meaning of a consent decree 'as written,' we are not to ignore the context in which the parties were operating, nor the circumstances surrounding the order." *Id.* at 959, *quoting Knote*, 29 F.3d at 1300.

The Consent Order is between the Commissioner and AMS. It stemmed from the Commissioner's investigation of AMS's sales practices and quality controls after receiving a complaint from the estate of an elderly woman who purchased over $500,000 in coins. The Order's fact section overwhelmingly focuses on how one AMS sales employee, David Davenport, pressured the woman into buying coins with practices banned by Minnesota law, and how AMS's internal systems failed to

prevent this. The Order addresses AMS's interaction with other customers only twice. *See* **Consent Order** ¶ 7 (stating Davenport made a similar misstatement about a canonization coin during "a call to a different customer"); *id.* ¶ 14 (noting AMS's "quality assurance team" reviewed "Davenport's phone calls with customers on 158 occasions," including "three calls to/from" the woman, and noted "violations or deviations of [AMS's]" procedures in 35 calls). The Order states Davenport violated § 80G.07(14) by misrepresenting AMS's sale terms when he did not disclose its terms reducing the period to sue to one year.

The Order requires that AMS update its quality assurance and compliance system, and that AMS "shall not rely on any of its written terms or conditions of bullion coin/product sale to a consumer unless: (1) the term or condition upon which Respondent seeks to rely was disclosed to the consumer in accordance with Minn. Stat. § 80G.07, subd. 1, or (2) the consumer and Respondent have a signed written agreement for the purchase of bullion products disclosing such terms." *Id.* at 7-8.

This one provision is the only mention of a future "consumer." The Order does not otherwise mention future victims or enforcement by the Commissioner, let alone enforcement by private parties.

Moreover, the Order enforced § 80G.07, part of Minnesota's Bullion Product Dealers laws, Minn. Stat. Ann. ch. 80G. That Chapter does not authorize private enforcement. Rather, it empowers the Commissioner either to institute "an action in the district court to" enjoin violations and require compliance with the Chapter, or to issue an order for compliance against a person who violates the Chapter. **Minn. Stat. Ann. § 80G.10(1), (4)(a).** Compliance orders may "direct[] the person to cease and desist from engaging in the act, practice, or conduct or to take other action necessary or appropriate to comply with this chapter." **Minn. Stat. Ann. § 80G.10(4)(a)(1).** "If a person does not comply with an order under this section, *the commissioner* may petition a court of competent jurisdiction to enforce the order." **Minn. Stat. Ann. § 80G.10(4)(e)** (emphasis added).

This statutory scheme suggests that the Commissioner has sole authority to enforce orders under the Bullion Product Dealers laws. This interpretation is reinforced by the Order's omission of any language about third-party enforcement.

In this context, the Order reflects an intent to confer a benefit on third-party consumers, but does not reflect an intent to provide an "enforceable right to that benefit." The Order prohibits AMS from relying on terms in violation of § 80G.07, which benefits consumers by preempting unfair terms that they did not accept. However, the omission from the Order of any way for a third-party consumer to enforce that benefit suggests that the Order anticipated only the Commissioner enforcing its provisions.

Because the Order does not evince an intent to provide Plaintiffs "a legally binding and enforceable right" to this benefit, they lack standing to enforce the order and avoid arbitration on the basis of it. *See Pure Country*, 312 F.3d at 958.

However, genuine issues of material fact remain about whether and for what purchases the parties agreed to arbitrate, so "the next step [is] to hold a trial." *Duncan*, 20 F.4th at 403; *accord Foster*, 15 F.4th at 862; *see* **9 U.S.C. § 4** ("If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."). "[T]he arbitrability of a dispute is a gateway issue" and "the parties are entitled to have the correct venue—court or arbitration—established at the outset." *Duncan*, 20 F.4th at 404 (quotations omitted).

\* \* \* \* \* \* \*

This Court reverses and remands the case for trial on the arbitration issue under 9 U.S.C. § 4.

_____

-25-